# FOR PUBLICATION



FILED

Jul 30 2014, 10:04 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JAMES D. CRUM**
**CATHY M. BROWNSON**
Coots, Henke & Wheeler, P.C.
Carmel, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| TERMINATION OF THE PARENT-CHILD | ) | |
| RELATIONSHIP OF: | ) | |
| | ) | |
| S.E. (Minor Child), | ) | |
| | ) | |
| And | ) | |
| | ) | |
| R.K. (Mother), | ) | No. 29A02-1312-JT-1064 |
| | ) | |
| Appellant/Respondent, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE INDIANA DEPARTMENT OF | ) | |
| CHILD SERVICES, | ) | |
| | ) | |
| Appellee/Petitioner. | ) | |

APPEAL FROM THE HAMILTON CIRCUIT COURT
The Honorable Paul Felix, Judge
Cause No. 29C01-1203-JT-413

July 30, 2014

**OPINION – FOR PUBLICATION**

**VAIDIK, Chief Judge**

## Case Summary

R.K. ("Mother") appeals the termination of her parental rights to her daughter, S.E. Mother, who is deaf, contends that the trial court denied her due process by requiring her to use sign language when she testified at the termination hearing. She also argues that there is insufficient evidence to support the termination order.

Trial courts have wide latitude to control the flow of the proceedings and the presentation of evidence. In some cases, an interpreter may be required to ensure that the trier of fact hears and understands a witness's testimony. Here, the trial court could not understand Mother when she attempted to testify orally. As a result, the trial court required Mother to testify by signing to an interpreter, who then spoke Mother's responses aloud. We conclude that this procedure did not violate Mother's due-process rights. We also conclude that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship. We affirm.

**Facts and Procedural History**

Mother gave birth to a daughter, S.E., on January 4, 2011.[1] Mother, who is in her early thirties, was born with hearing loss and became deaf as an adult. Mother has a serious and complicated medical history. She suffers from foot, knee, back, and neck pain. Among other things, she has fibromyalgia, scoliosis, degenerative disk disease, arthritis, irritable bowel syndrome, high blood pressure, and acid reflux. She also has blood clots in her lungs and elevated white blood cell counts. Mother has been diagnosed with attention deficit disorder (ADD), borderline personality disorder, depression, and anxiety, and she takes medications for these diagnoses. She has attempted suicide more than twenty times and has been hospitalized more than fifty times.

A few months after S.E.'s birth, Mother began living in a homeless shelter. Shelter staff contacted the Hamilton County Department of Child Services (HCDCS) with concerns about Mother's ability to care for S.E. A short time later, HCDCS filed a petition alleging that S.E. was a child in need of services ("CHINS"), but allowed S.E. to remain in Mother's care. Around that time, Mother moved into her mother's home.

S.E. was adjudicated a CHINS in June 2011 and removed from Mother's care. Mother was ordered to do a number of things designed to facilitate reunification, including:

- Obtain and maintain appropriate housing and a source of income
- Successfully complete a parenting assessment
- Successfully complete home-based therapy
- Successfully complete individual counseling
- Successfully complete a mental-health evaluation and medication-management services

---

[1] L.E. is S.E.'s biological father. He does not participate in this appeal.

- Attend all scheduled parenting time with S.E.

*See* State's Ex. 7.

Mother's compliance with the trial court's order was sporadic and ultimately unsuccessful. In late 2011 Mother did not participate in services or exercise parenting time with S.E. regularly. By early 2012 Mother was still failing to exercise parenting time consistently. She had not completed a mental-health evaluation and was not participating in individual counseling or any mental-health treatment. In August 2012 Mother gave birth to another child, E.K.[2] E.K. was removed from Mother's care three days after her birth, and a CHINS petition was filed for E.K. a short time later.

Because she continued to attend parenting time inconsistently, Mother's parenting time was suspended in October 2012. Two months later, the trial court suspended all services due to Mother's noncompliance. In March 2013 Mother abruptly moved to Terre Haute to live with her boyfriend. The same month, HCDCS filed a petition to terminate Mother's parental rights. The trial court held three hearings on the termination petition in July and September 2013.

At the hearings, those involved in the case expressed concern about Mother's health and her ability to parent S.E. Throughout the case, Mother saw a number of different service providers. Multiple providers were unable to provide services to Mother because she was confrontational, accusatory, or noncompliant. Tr. p. 23 (testimony of psychologist Dr. Tyrone Powell), 56 (testimony of social worker Cristina Werremyer), 120 (testimony of social worker Carol Ganza), 236 (testimony of therapist John Polstra).

---

[2] The initials of Mother's youngest child are E.K. The transcript refers to the child incorrectly as A.K.

4

Dr. Dawn Castner-Rector, a psychologist, was the only service provider working with Mother at the time of the hearings. Dr. Castner-Rector described Mother's progress as "mild" and testified that she would need ongoing mental-health services "for an extended period of time[,] if she's motivated to participate in services." *Id.* at 83-84.

Jerri Gibson, Mother's case manager, also summarized Mother's progress:

Q: Ultimately by the end of your time overseeing the case, what had successfully occurred as far as goals reached and referrals completed successfully, if anything?

A: I can't say that anything ended and was completed successfully other than the psych evaluation was completed.

Q: Did the necessity to supervise visitation ever halt?

A: No.

Q: Did visitations ever increase as far as the amount of time per visitation or the number of visitations offered per week or per month?

A: No. In fact, visits decreased.

*Id.* at 302-03. Gibson also described S.E. as "happy" and "content" in her foster placement. *Id.* at 304. She recommended terminating Mother's parental rights. *Id.*

Vivian Gross, the guardian ad litem (GAL) assigned to the case, also testified. GAL Gross stated that she did not believe S.E. would be safe in Mother's care. *Id.* at 351. She also testified that S.E. had adjusted to her foster home and was happy there. *Id.* at 352-53. She likewise recommended terminating Mother's parental rights. *Id.* at 355.

Before Mother took the stand, there was a discussion about how she would testify due to her deafness:

5

MOTHER'S COUNSEL:   As a procedural issue, is my client going to be speaking or is the interpreter going to be speaking?

THE COURT:   The interpreter will need to speak for her as she signs back and we'll show that she's been sworn . . . if you could do that for me as an assistance to the Court.

INTERPRETER:   Okay.

MOTHER'S COUNSEL:   Do you guys, do you want to explain that to her?

THE COURT:   Is she more comfortable testifying that way, [counsel]?

MOTHER'S COUNSEL:   I need to know does she want to speak?

INTERPRETER:   Prefers to speak.

THE COURT:   She prefers to speak then?

MOTHER'S COUNSEL:   Yeah, she does.

THE COURT:   Okay.

MOTHER'S COUNSEL:   It is from my experience sometimes difficult to understand her and we are making a record here for the appellate court. It will be difficult I think for the court reporter to – we'll try it.

THE COURT:   Well, it's your client and her record so if the Court's record can't be clear by her speaking and you would wish to have a more clear record by the interpreter speaking for her, then let's proceed in that fashion if you're desiring to preserve a clear record.

MOTHER'S COUNSEL:   I mean ultimately that's my goal. So I'm willing to let her try it but in the event that it's not going well, we'll need to stop.

6

| | |
|---|---|
| THE COURT: | Al[right]. You'll need to be the judge of that then because I may understand what she says and you may not or vice versa. So if I can't understand her, I'll certainly let you know. |
| MOTHER'S COUNSEL: | Thank you. Please state your name for the record. |
| MOTHER: | [R.K.]. |
| MOTHER'S COUNSEL: | And you are the mother of S.E., correct? |
| MOTHER: | Yes, ma'am. |
| THE COURT: | Okay, we'll need to have the interpreter. |

*Id.* at 453-54. Mother gave the rest of her testimony through the interpreter.

In December 2013 the trial court entered a twenty-seven-page order with findings terminating Mother's parental rights. Appellant's App. p. 7-33. In its very detailed order, the court described Mother's health issues and her lack of participation and progress in services:

> [Mother] continues to have mental-health issues that make her unable to adequately parent [S.E.]. These issues have existed for her since at least the age of ten [], and remain without remedy through the date of the final termination [hearing] . . . .
>
> [Mother] has received treatment since at least the age of ten [] for these issues, which has included multiple hospitalizations, assessments, treatment programs, medications, and counseling attempts. DCS in Madison, Hamilton, and Vigo Counties have all added to the extensive history of these efforts, without being able to achieve any measure of success in remedying her condition or eliminating her parenting deficits[.]
>
> [Mother] has failed to adequately participate in services offered by DCS. Her participation, when active, has been marked by a familiar pattern . . . centered around belligerence, denial of responsibility, combativeness, distorted perception, and ultimately withdrawal by [Mother]. The list of therapists and doctors that have ceased participation during the lifetime of [S.E.] in these proceedings alone is comprehensive, illustrative, and extensive, and applies to virtually every such professional except the latest

7

therapist at Hamilton Center, who continues to observe parenting deficits and continues to recommend basic and remedial parenting-skills training for [Mother]. This training was not even scheduled to begin until after the conclusion of the terminating proceedings[.]

[Mother] has refused to participate in good faith with DCS-provided services, and has actively undermined and/or sabotaged such efforts for multiple superficial reasons, but which ultimately return to the underlying fact that her mental-health issues remain unresolved.

\* \* \* \* \*

[S.E.] has been removed from . . . [Mother] since June of 2011, a time period of approximately twenty-seven (27) consecutive months . . . . [S.E.] has resided with her current pre-adoptive foster family since August of 2012 . . . . [S.E.] knows this family as her own, and identifies the foster parents as her mother and father. It would be devastating to [S.E.] to be removed from this family. The foster family has identified and overcome multiple physical and psychological issues that [S.E.] had when they took [her] into their home. They are diligent and loving, provide [S.E.] with her daily necessities, both physical and emotional, and are clearly an appropriate final placement for the child.

The child's DCS case manager, GAL, and foster mother have all testified that termination of the parent-child relationship and adoption of the child are in her best interests. The court agrees with these opinions . . . .

\* \* \* \* \*

There is a reasonable probability that the conditions that resulted in [S.E.'s] removal from and continued placement outside the care and custody of [Mother] will not be remedied.

*Id.* at 30-32 (formatting altered).

Mother now appeals.

**Discussion and Decision**

On appeal, Mother contends that the trial court denied her due process by requiring her to use sign language when she testified at the termination hearing. She also argues that there is insufficient evidence to support the termination order.

8

# I. Sign-Language Interpreter

Mother first contends that the trial court denied her due process by requiring her to use sign language when she testified at the termination hearing. Mother did not challenge this procedure at the trial level; instead, she raises this due-process argument for the first time on appeal.

The State must satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution when it seeks to terminate the parent-child relationship. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006) (citation omitted), *trans. denied*. Due process in parental-rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting the use of the challenged procedure. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011) (citing *A.P. v. Porter Cnty. Office of Family & Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *reh'g denied*, *trans. denied*). The private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of his or her child. *Id.* (citation omitted). And the State's interest in protecting the welfare of a child is also substantial. *Id.* Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions. *Id.*

Any procedural irregularities in a CHINS proceeding may be of such significance that they deprive a parent of procedural due process with respect to the termination of his or her parental rights. *A.P.*, 734 N.E.2d at 1112-13. Nevertheless, a parent may waive a

9

due-process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194-95 (Ind. Ct. App. 2003); *see also In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (by raising issue for first time on appeal, mother waived due-process claim that trial court violated her rights in failing to follow statutory requirements governing permanency hearings, case plans, and dispositional orders). Here, Mother never objected to the interpretation procedure used by the trial court; therefore, she has waived this challenge.

Waiver notwithstanding, we cannot agree that Mother was denied due process when the trial court required her to testify through an interpreter. Interpreters serve not only defendants, but our trial courts as well. In light of this dual duty, interpreters are often referred to as "defense interpreters," who translate for the benefit of the defendant, or "proceedings interpreters." *See Arrieta v. State*, 878 N.E.2d 1238, 1242-44 (Ind. 2008). Proceedings interpreters "serve[] judge, counsel, parties, and jury by translating to or from English during various events in a case." *Id.* A proceedings interpreter may be required during "the taking of testimony" to ensure "that the finder of fact hears all probative testimony, some of which might otherwise be unavailable or misconstrued." *Id.*

Here, the trial court initially agreed to allow Mother to testify orally, but it stopped her when it could not understand her testimony, determining that an interpreter was necessary. *See* Tr. p. 453-54 (Trial court: "So if I can't understand [Mother], I'll certainly let you know."). The court was within its discretion in making this decision.

10

Indiana Rule of Evidence 611(a) explains that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Rule 611(a) acknowledges that the process of examining witnesses, while conducted by counsel, is subject to the control of the trial court, "which has a wide discretion therein. Phases of the examination, such as the length and time that a witness shall be examined, and the manner and mode of [] examination, are under the control of, and within the discretion of, the trial court." *Sowders v. Murray*, 151 Ind. App. 518, 525, 280 N.E.2d 630, 635 (1972).

We acknowledge Mother's preference for communicating orally rather than through sign language. But we can conceive of no other method the trial court could have used that would have ensured that it heard and understood Mother's testimony. And Mother fails to establish that testifying this way prejudiced her. Although she gives one example of testimony as proof that "communication error[s] occurred," Appellant's Br. p. 17, this single example does not establish that the interpreter—or Mother—made a mistake. To the extent that Mother asserts that she is not adept at using sign language, Mother never indicated that she was having difficulty explaining herself using sign language at the terminating hearings. We cannot say that the trial court violated Mother's due-process rights by requiring her to testify by signing to an interpreter.

## II. Termination of Parental Rights

11

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation omitted). "And a parent's interest in the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests recognized by the courts.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (citations omitted). Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id.* (citation omitted). A parent's rights may be terminated if the parent is unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id.* (citations omitted).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted). Instead, we consider only the evidence and reasonable inferences that support the judgment. *Id.* (citation omitted). "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the

findings and the findings clearly and convincingly support the judgment." *Id.* (citation omitted).

A petition to terminate parental rights must allege:

(A) that one (1) of the following is true:

   (i)   The child has been removed from the parent for at least six (6) months under a dispositional decree.

   (ii)  A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

   (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

   (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

   (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

   (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

13

Ind. Code § 31-35-2-4(b)(2). "DCS must prove the alleged circumstances by clear and convincing evidence." *K.T.K.*, 989 N.E.2d at 1231 (citation omitted). On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's judgment as to subsections (B) and (C) of the termination statute.

*A. Conditions Remedied*

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, HCDCS was required to establish, by clear and convincing evidence, only one of the three requirements of subsection (B). Because we find it to be dispositive, we address only the arguments regarding subsection (B)(i); that is, whether there was a reasonable probability that the conditions resulting in S.E.'s removal or the reasons for her placement outside Mother's home would be remedied.

In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* (quotation omitted). The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* (citations omitted). In so doing, trial courts have discretion to "weigh a parent's prior

14

history more heavily than efforts made only shortly before termination," and courts may find "that parents' past behavior is the best predictor of their future behavior." *Id.*

Here, the trial court concluded that there was a reasonable probability that the conditions resulting in S.E.'s removal from Mother's care or placement outside her home would not be remedied. The court was primarily concerned with Mother's extensive health problems, particularly her mental-health issues. The court explained that:

> [Mother] continues to have mental-health issues that make her unable to adequately parent [S.E.]. These issues have existed for her since at least the age of ten [], and remain without remedy through the date of the final termination [hearing] . . . .
>
> [Mother] has received treatment since at least the age of ten [] for these issues, which has included multiple hospitalizations, assessments, treatment programs, medications, and counseling attempts. DCS in Madison, Hamilton, and Vigo Counties have all added to the extensive history of these efforts, without being able to achieve any measure of success in remedying her condition or eliminating her parenting deficits[.]

*Id.* at 30. Because Mother "refused to participate in good faith with DCS-provided services, and has actively undermined and/or sabotaged such efforts for multiple superficial reasons," those issues remained unresolved at the time of the termination hearing. *Id.*

The evidence provided at the termination hearings supports the trial court's findings. Multiple service providers testified that they were unable to provide services to Mother because she was confrontational, accusatory, or noncompliant. The lone provider still working with Mother at the time of the hearings, Dr. Castner-Rector, characterized Mother's progress as mild, and Gibson, Mother's case manager, testified that Mother made essentially no progress while the case was pending.

15

In arguing that the evidence does not support termination, Mother claims that she was making progress, however mild, with Dr. Castner-Rector. She also claims that she can provide financially for S.E. because she receives social-security disability payments. We do not find these arguments persuasive. To the extent Mother contends she began making progress just before the termination hearings, the trial court was well within its discretion to discount this, particularly in light of Mother's history of noncompliance and refusal to participate in services. *See E.M.*, 4 N.E.3d at 643. And even if Mother is capable of providing financially for S.E. as she claims, that does not mean that Mother is capable of parenting S.E. The primary issue throughout this case has been Mother's health, specifically her mental health. The trial court's extensive findings show—and Mother does not dispute—that Mother's mental-health problems were not resolved at the time of the termination hearings, despite HCDCS's efforts.

The evidence supports the trial court's conclusion that there was a reasonable probability that the conditions resulting in S.E.'s removal or the reasons for her placement outside Mother's home would not be remedied.

### B. Best Interests

Mother also contends that termination of her parental rights is not in S.E.'s best interests. In determining what is in a child's best interests, the trial court must look to the totality of the evidence. *See A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied.* "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* "Moreover, we

have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that terminating is in the child's best interests." *Id.* (citation omitted).

Gibson, Mother's case manager, and the GAL assigned to the case recommended terminating Mother's rights. They testified that Mother failed to participate or benefit from services and continued to have significant mental-health problems. They also testified that S.E. is thriving in her current foster-care placement. Referencing this testimony, the trial court found that:

> [S.E.] has been removed from . . . [Mother] since June of 2011, a time period of approximately twenty-seven (27) consecutive months . . . .[S.E.] has resided with her current pre-adoptive foster family since August of 2012 . . . .[S.E.] knows this family as her own, and identifies the foster parents as her mother and father. It would be devastating to [S.E.] to be removed from this family. The foster family has identified and overcome multiple physical and psychological issues that [S.E.] had when they took [her] into their home. They are diligent and loving, provide [S.E.] with her daily necessities, both physical and emotional, and are clearly an appropriate final placement for the child.

Appellant's App. p. 31.

Again, Mother contends that the trial court failed to credit her recent progress, and she also argues that S.E. can remain in foster care until Mother is ready to parent her. Appellant's Br. p. 24-25. But as we have already explained, the trial court was within its discretion, in light of Mother's history of noncompliance, to discount any last-minute efforts by Mother. And after twenty-seven months in foster care, S.E. should not be forced to wait any longer to see if Mother will resolve the issues that led to her removal more than two years earlier.

17

We conclude that the evidence supports the trial court's determination that termination of Mother's parental rights is in S.E.'s best interests. *See In re A.I.*, 825 N.E.2d 798 (Ind. Ct. App. 2005) (testimony of caseworkers, together with evidence that the conditions resulting in placement outside the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination was in child's best interests), *trans. denied*; *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them).

Affirmed.

NAJAM, J. and BROWN, J. concur.