## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 09 2015, 6:02 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Carolyn J. Nichols
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputies Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:
S.E. (Minor Child), a Child in
Need of Services, and

L.E. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

February 9, 2015

Court of Appeals Case No.
29A02-1406-JC-416

Appeal from the Hamilton Circuit
Court.
The Honorable Paul A. Felix, Judge.
The Honorable Todd L. Ruetz,
Magistrate.
Cause No. 29C01-1106-JC-843

**Baker, Judge.**

[1] L.E. (Father) appeals the juvenile court's order finding his child, S.E. (Child), to be a Child in Need of Services (CHINS). Father challenges a number of the juvenile court's factual findings and contends that there is insufficient evidence supporting the CHINS adjudication. Finding no error and sufficient evidence, we affirm.

## Facts

[2] On January 4, 2011, Child was born to Father and Mother.[1] On April 8, 2011, DCS received a report that Mother, who was residing in a shelter with Child, had to be reminded to feed, change, and bathe the infant. Based on that report, DCS filed a petition in Madison County alleging that Child was a CHINS.

[3] On April 18, 2011, Mother obtained a protective order against Father based on her allegations of domestic violence. Father was later arrested based on these allegations but the charges were eventually dismissed. That same date, DCS placed Child in the care and custody of her maternal grandmother.[2] Father went to live with his mother in Michigan.

[4] In late April 2011, Family Case Manager (FCM) Rebecca Dunn contacted Father by email and informed him of the ongoing DCS investigation as well as an upcoming court date. Father did not attend the court hearing. Following a

---

[1] Mother's parental rights have been terminated and she is not taking part in this appeal. *S.E. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 37 (Ind. Ct. App. 2014) (affirming the termination of her parental rights), *trans. denied*.

[2] At some point, Child was removed from relative care and placed in foster care.

factfinding, the Madison County juvenile court found Child to be a CHINS on June 9, 2011, and subsequently transferred the case to Hamilton County.

[5] Hamilton County FCM Jeri Gibson made multiple attempts to locate Father. Between July and November 2011, FCM Gibson made six to eight phone calls to possible numbers for Father and his family members, leaving voicemails each time. In November 2011, Father, still residing in Michigan, returned one of FCM Gibson's calls. During their phone conversation, FCM Gibson explained what was going on with Child and informed Father that there was an upcoming CHINS hearing on December 19, 2011. Father stated that he would try to attend the hearing, but did not end up doing so. Father agreed to participate in a Fatherhood Engagement Program. That service was closed unsuccessfully in December 2011 because of Father's "lack of commitment" and the provider's inability to maintain contact with Father. Tr. p. 148.

[6] FCM Gibson had a very difficult time maintaining any contact with Father between November 2011 and April 2012. Once she was finally able to reach Father, FCM Gibson scheduled a visit for Father and Child for April 4, 2012. Father attended that visit and told FCM Gibson that, although he wanted to care for Child, he was not able to at that time. Father acknowledged to FCM Gibson that he was struggling with mental health issues and unstable housing.

[7] FCM Gibson attempted unsuccessfully to maintain contact with Father. In June 2012, Father's phone number was no longer working. FCM Gibson was unable to reach Father again until August 2012. On August 8, 2012, Father

refused to provide FCM Gibson with his address. FCM Gibson informed Father that he was entitled to have visits with Child and that he merely needed to notify DCS when he would be traveling to Indiana so that a visit could be scheduled. Between April 2011 and February 2014, Father visited Child only four times.

[8]   Father has struggled with mental health issues "over the years," and has been diagnosed with schizophrenic paranoia, depression, anxiety, bipolar disorder, and post-traumatic stress disorder. Tr. p. 108. Father takes medication for his mental health issues and was receiving mental health treatment at the time of the CHINS hearing. He has also struggled with housing stability, though at the time of the CHINS hearing, he had been living in a one-bedroom apartment in Michigan for approximately one and one-half years.

[9]   Father receives SSI benefits of $710 a month. While he testified that his monthly rent is $475, he had previously told the Guardian ad Litem (GAL) that his rent is $710. Father told the GAL that he had "no clue" what his monthly expenses were. *Id.* at 169. He has never paid child support. While Father reported that, in the past, he has supplemented his SSI income with part-time jobs, at the time of the factfinding hearing, he was no longer able to work part-time jobs as his "time is basically gone" because he was attending community college classes. *Id.* at 128.

[10]  On March 21, 2012, DCS filed a petition to terminate the parental rights of both parents. Eventually, following a number of hearings and continuances, on July

23, 2013, the juvenile court found that Father had not received sufficient legal notice of the CHINS proceeding. Consequently, the juvenile court ordered that a new CHINS factfinding hearing be held for Father.

[11] On November 1, 2013, DCS filed an amended CHINS petition regarding Father. A factfinding hearing was held on December 2, 2013, and February 26, 2014. Father attended the first hearing in person and appeared telephonically at the second. On April 21, 2014, the juvenile court found Child to be a CHINS. On May 12, 2014, the juvenile court entered a dispositional order that required Father to participate in a number of services, including parenting and substance abuse assessments and visits with Child. Father now appeals.

# Discussion and Decision

## I. Standard of Review

[12] Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.,* 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*
>
> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory

circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.,* 919 N.E.2d at 105.

In this case, DCS alleged the children were CHINS under the general category of neglect as defined in Indiana Code section 31–34–1–1. The statute reads as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) The child needs care, treatment, or rehabilitation that;
>
>> (A) The child is not receiving; and
>
>> (B) Is unlikely to be provided or accepted without the coercive intervention of the Court.

Ind. Code § 31–34–1–1 (2008).

[13] *In re K.D.*, 962 N.E.2d 1249, 1253-54 (Ind. 2012) (footnote omitted). The purpose of a CHINS adjudication is to "protect children, not punish parents." *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010).

# II. Factual Findings

Father challenges a number of the juvenile court's factual findings. As we consider these arguments, we note that we defer substantially to findings of fact. *In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014).[3]

## A. Paragraph Four

Father first challenges the first sentence of paragraph four: "In April of 2011, the child was removed from the home and care of the child's biological mother and father by the DCS local office in Madison County, Indiana." Appellant's App. p. 28. Father argues that this finding is incorrect because Child was removed only from the care of Mother at that time.

While it is true that Child was not in Father's care and custody at the time removal was ordered, it is also true that Child was then placed in relative care and, later, in foster care. A necessary corollary to being placed in relative care is the absence of a suitable parent placement. Whether or not Child was technically removed from Father's care at that time is beside the point, which is that the juvenile court had no suitable alternative except for placement with someone other than a parent. *See, e.g.*, *In re K.H.*, 688 N.E.2d 1303, 1305 (Ind. Ct. App. 1997) (holding that where mother had sole custody of child and father was incarcerated when child was removed from mother, "the child was

---

[3] The juvenile court's order does not number its findings and conclusions. For the sake of citation clarity, we will number each paragraph and cite accordingly. Appellant's App. p. 28-30.

effectively removed from the custody of both parents" when placed in foster care). In other words, when Child was removed from Mother, she was also effectively removed from Father. Consequently, we find the substance of this finding to be correct—as of April 2011, Child was placed outside the care and custody of Father.

## B. Paragraph Five

Next, Father finds fault with the first two sentences of paragraph five:

> [O]n or about April or May of 2011, the biological father had been in contact by email communications with the DCS case manager in Madison County overseeing the CHINS matter for the child. The biological father was therefore aware of the CHINS proceedings pertaining to the child.

Appellant's App. p. 28. Father makes much of the fact that he did not receive legal notice of the CHINS proceeding. That fact, however, is undisputed and beside the point. Indeed, the juvenile court ultimately agreed with Father and ordered a new factfinding hearing as a remedy for the lack of notice. The question is whether Father was *aware* of the CHINS proceedings, not whether he had received legal notice of those proceedings.

The record reveals that on April 26, 2011, FCM Dunn sent Father an email informing him of the allegations of domestic violence. Father responded and denied the allegations. Father testified at the CHINS hearing that during that email correspondence, FCM Dunn informed Father of a pending court date related to Child:

| DCS: | . . . What I'm basically getting at is that there was established communications by e-mails between yourself and the DCS office where the CHINS case had started as of April of 2011. Is that a correct statement? |
| Father: | Yes. |
| DCS: | Do you recall Ms. Dunn also informing you of a court date in that county for May 18th of 2011? |
| Father: | I can't say for sure. I recall something about a court date pending, coming up so. |
| DCS: | Okay. And you may not remember the official date, but do you recall that she provided you with a date? |
| Father: | Yes, to some degree. I don't know if it was by e-mail or by letter. |

Tr. p. 122-23. This evidence sufficiently establishes that Father was aware of the CHINS proceedings in April 2011.

# C. Paragraph Six

Next, Father turns to paragraph six of the juvenile court's order:

> DCS case managers in Hamilton County, following the transfer of the case to this jurisdiction, had intermittent contact with the father in the time period leading to the CHINS fact-finding hearings conducted in regards to the father on 12/2/13 and 2/26/14. FCM Gibson made multiple attempts to reach the father by telephone using numbers believed to be family members of the father, beginning in July of 2011, but did not get a response until November of 2011. FCM Gibson made referrals for the father to participate in the Father Engagement Program and notified the father of the hearing scheduled for 12/19/11, which father stated he would attend. The father failed to appear for the hearing or notify the Court of any reason why he could not then attend. The Father Engagement Program also recommended to DCS the closure of the referral as of December of 2011 due to the father not responding to efforts to communicate with him or initiate this service.

Appellant's App. p. 28-29.  Father again focuses on the fact that he did not receive legal notice of the CHINS proceedings.  Again, we note that this fact is undisputed and not at issue.  This paragraph does not find that Father received legal notice; instead, the juvenile court merely lists all of the efforts made by DCS to contact and engage Father in the CHINS proceedings.  Father does not raise any factual errors contained in this paragraph, and we find none.

## D.  Paragraph Seven

Father next directs our attention to paragraph seven of the juvenile court's order:

> The father has previously declined to give housing information in response to DCS inquiries in the time period prior to the fact-finding hearings.  The father currently resides in a one bedroom apartment in Port Huron, Michigan, and is a full-time college student in that location.  The father does not have a viable or completed plan for how he would arrange his time in order to ensure full-time care for the child if the child were to be returned to his care.  The father's described plans include having his mother move in with him to provide care while he is out.  However, he has not confirmed that his mother is either able or willing to make such a move, and that individual [is] not currently residing in the home, but lives in another city in the State of Michigan.

*Id.* at 29.  Again, Father does not contend that there any actual errors of fact in this paragraph.  Instead, he emphasizes the stability of his housing at the time of the CHINS hearing—which the trial court acknowledged—and the possibility of his mother moving and helping with childcare—which the trial court also acknowledged.  He concedes, however, that his plans were not final.  And while he contends that he would be capable of altering his class schedule

and course load, as well as finding daycare facilities and applying for subsidies, the record reveals that at the time of the CHINS hearing, none of this was in place. Consequently, we find no error in this paragraph of the juvenile court's order.

## E. Paragraph Eight

[25] Father next turns to paragraph eight of the juvenile court's order:

> The father's financial stability is insufficient to enable him to provide for the daily care and expenses of the child if she were to live with him. The father's main source of income is SSI payments, and he also receives financial aid for his college expenses and relies upon government food aid assistance. The GAL testified during the fact-finding hearing as to the father's own rendition of his expenses, which indicated that father's SSI income is entirely used to pay his rent, and the father has no additional income for other expenses, which would include the child's needs. This testimony is accepted and found by the Court as fact for the purposes of the CHINS fact-finding proceedings.

[26] *Id.* Father directs our attention to his testimony that he had sufficient income to meet the needs of his family. There is evidence in the record, however, supporting the trial court's findings on this issue.

[27] Specifically, Father admitted that his finances prevented him from visiting Child. Appellant's Br. p. 33; tr. p. 125. Moreover, Father missed at least two CHINS hearings because of his finances. Tr. p. 20, 125, 132. Finally, the GAL testified that Father had "no clue" about his monthly expenses and reported to her that his monthly SSI income and his monthly rent payments were both $710. *Id.* at 169.

Father's argument amounts to a request that we reweigh this evidence, and we decline that request. We find no errors of fact in this paragraph.

## F. Paragraph Nine

Next, Father directs our attention to a portion of paragraph nine: "During these visits [with Child], the father's original plan was to sleep in the bus station in Indianapolis, but DCS has helped to arrange for him to stay in a homeless shelter, as the father has no financial means for other facilities." Appellant's App. p. 29. Father observes that, in the end, he got a ride from his father rather than taking the bus for his first visit with Child. While that may be true, it does not undercut the juvenile court's finding that Father's *original* plan was to take a bus and sleep in the bus station. Consequently, we find no error in this paragraph.

## G. Paragraph Ten

Father next turns to paragraph ten, which relates to the four visits between Father and Child:

> The visits are facilitated by the child's foster parents, who have modeled a relaxed and inviting response to the father, which the child has adopted. However, the child perceives of these visits as a "play date" with an individual acceptable to her foster parents, rather than a visit with her biological parent or an individual who may assume parental duties for her. The child refers to the foster parents as her mother and father, and does not make the same reference to the biological father. The Court finds additionally that changing placement from the foster parents to the biological father would [] have a devastating emotional and mental health impact on the child.

*Id.* Again, Father makes no argument that the Court made an error of fact in this paragraph. Instead, he notes that he brought gifts with him to the visits, that he agreed that Child could call her foster parents "mother" and "father," and that he would not request any action that would have a devastating impact on Child.

Father suggests "a more gradual transition" from foster care to his home would be best for Child, contending that "it would not be necessary to abruptly remove the child from her foster home." Appellant's Br. p. 36. To the contrary, if, as Father argues, the CHINS finding were reversed, there would be an immediate and "abrupt" transition to Father's care and custody. It would require pulling Child out of the family she has lived with for years and placing her in sole custody of a person she has interacted with in person only four times between April 2011 and February 2014. His concession that a more gradual transition is in Child's best interests amounts to a concession that the CHINS case should remain open. In any event, we find no factual errors in this paragraph.

## H. Paragraph Eleven

Finally, Father argues that one sentence in paragraph eleven is erroneous: "The father has indicated in communications with DCS in April of 2012 that he knew he could not care for the child on his own and did not have support from his family." *Id.* at 30. Father does not argue that this is factually erroneous;

instead, he emphasizes that at the time of the factfinding hearing, he had achieved stability. We find no error of fact in this paragraph.

# III. CHINS Finding

[34] Having addressed all of Father's arguments regarding the juvenile court's factual findings, we now turn to whether those findings support the CHINS adjudication. In this case, DCS alleged that Child was a CHINS under the general category of neglect as defined in Indiana Code section 31-34-1-1. Consequently, DCS was required to prove, by a preponderance of the evidence, that:

> (1) The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) The child needs care, treatment, or rehabilitation that;
>> (A) The child is not receiving; and
>> (B) Is unlikely to be provided or accepted without the coercive intervention of the Court.

[35] In this case, the record reveals the following facts:

- Father visited Child only four times between April 2011 and February 2014.
- Father did not have a plan in place for childcare should Child be placed with him.
- Father did not have a financial plan in place to ensure his ability to meet Child's basic needs.
- Father failed to attend hearings in the CHINS case.

- Father moved to another State when his child was an infant and when a CHINS case had just been opened. It appears that he made no further inquiries about Child until DCS contacted him.
- Father failed to participate in a Father's Engagement service that would have helped to reunify him with Child.
- An immediate change in placement would be harmful to Child, who is bonded to her foster parents and has little to no relationship with Father.

[36] We find that the juvenile court did not err by concluding that these facts establish by a preponderance of the evidence that Child is a CHINS. Father argues that the CHINS finding is based solely on his financial circumstances, but we cannot agree. There are multiple facts in the record that are unrelated to his finances that support the CHINS finding.

[37] At the time of the CHINS hearing, it did appear that Father had begun to turn things around, and we commend him for that. He had achieved stable housing and was receiving mental health treatment. A CHINS finding is not akin to a termination of parental rights—it is not final, it does not mean that the relationship is severed. Instead, Child is a CHINS because Father still needs some assistance in a variety of ways to be an appropriate caregiver, and that assistance will not be in place absent the coercive intervention of the court.

[38] The judgment of the juvenile court is affirmed.

May, J., and Barnes, J., concur.