# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 15 2020, 9:00 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.N.S. (Father) and C.S. and A.J.S. (Minor Children); | June 15, 2020 |
| | Court of Appeals Case No. 19A-JT-2880 |
| A.S. (Father), | Appeal from the Marion Superior Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Ryan K. Gardner, Judge Pro-Tempore |
| The Indiana Department of Child Services, | The Honorable Peter Haughan, Magistrate |
| *Appellee-Petitioner* | Juvenile Court Cause No. 49D15-1901-JT-152 49D15-1901-JT-153 |
| and | |
| Child Advocates, Inc. | |
| *Appellee-Guardian Ad Litem* | |

**May, Judge.**

A.N.S. ("Father") appeals the involuntary termination of his parental rights to C.S. and A.J.S. (collectively, "Children"). Father argues the Department of Child Services ("DCS") violated his rights under the Americans with Disabilities Act ("ADA") and the Fourteenth Amendment to the United States Constitution when DCS did not accommodate "his numerous physical and mental disabilities[.]" (Br. of Appellant at 4.) We affirm.

# Facts and Procedural History

K.J. ("Mother")[1] (collectively with Father, "Parents") gave birth to C.S. on November 11, 2013, and A.J.S. on April 19, 2015. On June 10, 2016, DCS removed Children from Parents' care on an emergency basis because Parents were under the influence of heroin while Children were in their care and because the front yard of Parents' residence contained "the family's belongings as if they were evicted . . . [including] trash, clothing, electronics, and children's

---

[1] Mother voluntarily relinquished her parental rights to Children and does not participate in this appeal.

toys[.]" (App. Vol. II at 55.)  Children were placed with their Paternal Grandmother, where they remained throughout the proceedings.

[3] On June 14, 2016, DCS filed petitions alleging Children were Children in Need of Services ("CHINS") based on Parents' drug use and the condition of the family residence.  On September 2, 2016, the juvenile court held a fact-finding hearing on DCS's CHINS petitions.  Mother appeared at the hearing and admitted Children were CHINS.  Father was incarcerated[2] at the time of the hearing, and his counsel waived his right to a fact-finding hearing as to the CHINS allegation.  Based on Mother's admission, the juvenile court adjudicated Children as CHINS and immediately held a dispositional hearing.  On September 2, 2016, the juvenile court entered a dispositional order that required Father to enroll in, participate in, and successfully complete the Father Engagement Program; and also to contact the Family Case Manager ("FCM") within seventy-two hours of his release from incarceration.

[4] On October 25, 2016, Father pled guilty to Level 5 felony carrying a handgun without a license,[3] Level 6 felony operating a motor vehicle while intoxicated,[4] and Level 6 felony possession of a narcotic drug.[5]  He also admitted he violated his probation for an earlier conviction of Class A misdemeanor carrying a

---

[2] Based on the record, it seems Father was incarcerated at the time because of a probation violation.

[3] Ind. Code § 35-47-2-1(e).

[4] Ind. Code § 9-30-5-3(a).

[5] Ind. Code § 35-48-4-6(a).

handgun without a license.[6]  The criminal court sentenced Father to an aggregate sentence of six years, with three years executed in Community Corrections Home Detention and three years on probation, with mental health supervision and substance abuse treatment to be provided while on both Community Corrections and probation.

[5]     On December 2, 2016, Father and his counsel attended a periodic review hearing for the CHINS case during which the juvenile court noted Father was participating in services offered through his probation.  Father requested parenting time with Children, and the juvenile court granted him supervised parenting time with Children.

[6]     On June 23, 2017, the juvenile court held a permanency hearing during which the Guardian ad litem ("GAL") requested that Children's permanency plan change from reunification to adoption based on Mother's continued drug use and failure to successfully complete substance abuse treatment and Father's lack of ability to care for Children at the time.  Based thereon, the juvenile court changed Children's permanency plan to adoption.

[7]     In July 2017, DCS filed a petition to terminate Parents' parental rights to Children.  On September 29, 2017, the juvenile court held another permanency hearing.  DCS reported Children were in Paternal Grandmother's care and were doing well.  Father requested Children be placed with him.  The FCM

_____

[6] Ind. Code § 35-47-2-1(e).

reported Father had agreed to participate in home-based therapy, random drug screens, and a psychological evaluation. In its order from that hearing, the trial court noted:

> Father states that he is not "crazy" and is taking medication to address his mental health. Father states that he started suboxone two (2) weeks ago. Father states that he has stable housing and employment. Father states that he detoxed from methadone. Father states that he needs to obtain a bed for [Children]. Father states that he was released from house arrest in April. Father states that he does not want to see [Children] adopted out of his care.

(Ex. Vol. I at 87.) The juvenile court denied Father's request that Children be placed with him, and the court retained adoption as the permanency plan for Children.

[8] On October 3, 2017, Community Corrections indicated Father violated its terms; the matter was resolved shortly thereafter when Father wrote an apology letter. On January 19, 2018, the juvenile court held a permanency hearing. The trial court found in its termination order that Father appeared at this hearing, and DCS reported "that Father is engaged in Fathers [sic] Engagement and parenting, and that a mental health assessment was completed and it recommended a number of services." (*Id.* at 27.) A representative from Father' Engagement, a service in which the trial court ordered Father to participate, also reported that "he does not believe that Father has the right medication for himself and that Father is not following recommendations." (*Id.*) Based

thereon, the juvenile court ordered DCS to refer Father to the services recommended by the mental health assessment.

[9] On April 11, 2018, Community Corrections filed another notice of violation against Father. Subsequently,

> Father was taken into custody on April 16, 2018. On April 19, 2018, a probation violation relating to the Community Corrections violation was filed against Father. On April 23, 2018, Father admitted to being arrested and charged with the offense of Disorderly Conduct (Class B misdemeanor) in Boone County, Indiana. The criminal court ordered the revocation of his Community Corrections Home Detention and ordered his [sic] to serve executed time in the Department of Corrections [sic] ("DOC"). The court continued Father on probation on terms of strict compliance.

(*Id.*)

[10] On May 14, 2018, the juvenile court denied DCS's petition to involuntarily terminate Father's parental rights to Children and found:

> 6. [Father] has resided in the same residence for approximately two years. He received seven hundred and fifty dollars in social security benefits, as well as food stamps, and has given thought to working part-time.
>
> 7. [Father] received a traumatic brain injury earlier in life which has created a barrier to completing services.
>
> 8. Due to substantial pain from his injury, [Father] was prescribed pain pills for fifteen years. This was medically

stopped and [Father] sought out illegal drugs to deal with his pain.

9. [Father] detoxed from methadone. He has not ingested illegal drugs for six months.

10. [Father] is currently on a waiting list for pain management services.

11. Home based therapy was never successfully completed. [Father] has now found someone he feels he works well with at American Behavioral Counseling.

12. [Father] followed up mental health referrals but kept changing providers for one reason or another.

13. On April 10, 2018, [Father] was incarcerated and was planning on being released the day after trial in this matter. Prior to his incarceration, he was taking Luvox for his mental health issues. He is happy with his current medication and believed prior prescriptions were too strong.

14. A major concern about [Father] is his explosive anger that results from his being frustrated. Although [Father] had a great amount of service referrals in the CHINS case, there was no evidence that anger management was one.

15. [Children] and [Father] share a strong bond. From January of 2017 until April 10, 2018, he only missed about three parenting time sessions.

16. [Father] has been observed as having good parenting skills, and as being attentive and caring.

17. [Father] raised another child until age eleven.

18. [Father] feels he has a good support system in his aunt.

19. The Court wholly understands the efforts and referrals given by the IDCS. However, [Father] is participating at his level, and given the extra barrier of having a traumatic brain injury, additional time to reunify is not unreasonable.

20. [Father] will have to add services to what he is presently doing, such as a complete neurological make up. If he fails to cooperate, a new termination action can be filed.

(Ex. Vol. I at 129-30.)

[11] From May to mid-October 2018, Father participated in services such as substance abuse treatment, anger management, and medication management. The juvenile court ordered him to submit to random drug screens and to complete substance abuse and mental health assessments and follow all recommendations therefrom. On October 26, 2018, Father violated his Community Corrections placement by tampering with the strap of his electronic monitoring device. On November 11, 2018, he admitted violating his probation by doing so and the criminal court continued Father on probation.

[12] On December 21, 2018, the juvenile court held a periodic review hearing for which Father did not appear. The juvenile court acknowledged that Mother had recently consented to Children's adoption by Paternal Grandmother and

that Father had been recently released from incarceration[7] and was homeless. At the hearing, the visitation facilitator reported: "(1) Father sleeps in his car; (2) Father has requested Father Engagement; (3) parenting time goes well between Children and Father; and (4) he believes Father needs therapy." (App. Vol. II at 28.) Based thereon, the juvenile court ordered a neurological evaluation for Father and ordered him to participate in Father's Engagement. On January 31, 2019, DCS filed a second petition to involuntarily terminate Father's parental rights to Children.

[13] On February 14, 2019, Father admitted in criminal court that he violated his probation by testing positive for marijuana and failing to report to the Probation Department. The criminal court revoked Father's probation and ordered Father to serve ninety days in the Marion County Jail with a credit of twenty-two days. On February 20, 2019, the juvenile court issued an additional participation order for Father, ordering him to complete a substance abuse assessment and successfully complete all treatments, submit to random drug and alcohol screenings with the understanding that "any request for drug screen that is not completed in a timely manner will result in positive result indication[,]" (*id*. at 29), and participate in a mental health assessment and follow all recommendations.

---

[7] It is unclear from the record why Father was incarcerated.

[14]   On March 18, 2019, the Probation Department filed a notice of probation violation against Father because Father tested positive for marijuana, cocaine, and opiates.  On March 22, 2019, the juvenile court held a permanency hearing that Father did not attend.  Father's counsel requested that Father's mental health treatment be scheduled through Midtown.[8]  The trial court also noted in its order from that hearing, "DCS reports [F]ather has been incarcerated twice since November 2018."  (Ex. Vol. I at 125.)  On April 11, 2019, Father appeared before the criminal court. The court took the decision regarding Father's probation violation under advisement because Father enrolled in Midtown for mental health treatment and agreed to a drug screen, even though he indicated to the criminal court that the screen would be positive.

[15]   On June 17, 2019, the juvenile court held the first of three fact finding hearings regarding DCS's petition to involuntarily terminate Father's parental rights to Children.  On August 9, 2019, the Probation Department filed another notice of probation violation against Father because Father missed two drug screens and did not pay his court-ordered fees.  On September 9 and 12 the juvenile court held the last two fact finding hearings in the termination matter.  The juvenile court issued its order involuntarily terminating Father's parental rights to

---

[8] "Midtown" refers to the Midtown Community Mental Health Center, which has been renamed the Sandra Eskenazi Mental Health Center at Eskenazi Health. "Sandra Eskenazi Mental Health Center" https://perma.cc/NE4W-4XL2

Children on November 8, 2019, based on Father's non-compliance with services, drug use, and ongoing criminal activity.

# Discussion and Decision

[16] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge the credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[17] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A juvenile court must subordinate the interests of the parents to those of the child, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own child should not be terminated solely because there is a better home available for the child, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id*. at 836.

To terminate a parent-child relationship in Indiana, DCS must allege and prove:

> (A) that one (1) of the following is true:
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> > (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
> (B) that one (1) of the following is true:
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. "[I]f the State fails to prove any one of these statutory elements, then it is not entitled to a judgment terminating parental rights." *Id*. at 1261. Because

parents have a constitutionally protected right to establish a home and raise their children, the State "must strictly comply with the statute terminating parental rights." *Platz v. Elkhart Cty. Dep't of Pub. Welfare*, 631 N.E.2d 16, 18 (Ind. Ct. App. 1994).

[19] Father does not challenge the juvenile court's findings, and thus they stand proven. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct."). Father also does not challenge the trial court's conclusions. Instead, Father argues his parental rights were improperly terminated "after DCS failed to make any accommodation to his numerous physical and mental disabilities as required by the Americans with Disabilities Act and the Fourteenth Amendment." (Br. of Appellant at 8.)

[20] However, Father did not present this issue before the juvenile court, which would have allowed the juvenile court to determine if the services offered by DCS included appropriate accommodations. Thus, Father has waived this issue from our review. *See McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003) (issue waived because it was not first presented before the juvenile court). Waiver notwithstanding, we note that the failure to provide services as part of a CHINS proceeding cannot be used to attack an order of termination. *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) ("failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law").

[21]     In addition, the juvenile court made numerous findings in its termination order outlining the services offered to Father and his participation and progress, or lack thereof, in those services:

> 41.  DCS made multiple referrals for all court-ordered services during the pendency of the Children's CHINS cases[.]
>
> 42.  Although Father participated in Father Engagement program, he does not feel he has benefited from it.
>
> 43.  Despite receiving Father Engagement services from May 2017 to January 2018, Father made little progress toward the goals laid out by his provider, Simon Gelaye of Family and Community Partners, which included budgeting, engaging in services, accessing community resources, and finding the right treatment to address his emotional stability.
>
> 44.  Father indicated that he no longer wished to participate in this service, and it was therefore subsequently closed unsuccessfully.
>
> 45.  In July 2017, Father received a comprehensive mental health assessment through Dockside Services, administered by therapist Stephen Houston.
>
> 46.  Through that assessment Father was diagnosed with a heroin addiction and severe depression.
>
> 47.  The comprehensive mental health assessment recommended crisis intervention and therapy to address any underlying issues contributing to Father's substance abuse and depression.

48.   Father has had numerous therapists during the life of the CHINS cases who have attempted to help him address mental health and substance abuse issues.  Each of these therapists have unsuccessfully discharged him from their services with little to no progress having been made.

49.   Father does not believe that therapy will help address his issues.  He does not believe he needs therapy.

50.   At trial, Father could not recall anything that he had learned from his multiple therapists.

51.   Father often presented as agitated, impulsive, and erratic during his therapy sessions with Laurence Grant, who provided therapy services to Father from September 2018 to December 2018 through Phoenix Family & Community Partners.

52.   Father was unable to address issues related to mood regulation, substance abuse, and mental health due to his behavior and lack of communication[.]

53.   Father has completed multiple psychological evaluations.

54.  The most recent psychological evaluation was conducted on July 2, 2019 following a clinical interview and assessment, which also occurred on July 2, 2019.  Both evaluations were conducted by Elizabeth Kirsch, a psychometrist who is an expert in the field of counseling and psychology.

55.  Father's clinical interview and assessment resulted in diagnostic impressions of severe opioid use disorder and anxiety disorder being given in accordance with the DSM-5.

56. Father was using heroin daily leading up to the clinical interview and assessment, and he used heroin the day before the assessment.

57. The clinical interview and assessment also gave rule out [sic] impressions of bipolar disorder, posttraumatic stress disorder, and personality disorders.

58. At the conclusion of his psychological evaluation, Father was given DSM-5 diagnostic impressions of severe opioid use disorder, generalized anxiety disorder, posttraumatic stress disorder, paranoid personality traits, and avoidant personality traits.

59. The psychological evaluation made a number of recommendations for Father, including participation in a detox program, a psychiatric evaluation, and individual mental health counseling.

60. Despite Father's beliefs about therapy, mental health counseling is effective in treating anxiety and substance abuse issues.

61. Based on the results of his most recent psychological evaluation, Father possesses no significant limitations to his neuropsychological functioning, and his IQ falls within the low-average range.

62. Even though he suffers from traumatic brain injuries, Father is capable of learning and retaining information, as well as meaningfully participating in services meant to address issues related to substance abuse and mental health.

63. Although he has that ability, the Court finds that Father has not meaningfully participated in services provided to him to address his substance abuse, mental health, and pain issues.

* * * * *

74. Father does not believe that additional services or medical treatment will address his issues, and he testified that he does not want to receive additional services from DCS. Father believes that all of the services provided to him have only made him worse.

(App. Vol. II at 29-30.) As indicated in the juvenile court's findings, Father was given the opportunity to engage in a variety of services over the three years of the CHINS proceedings. He cannot now complain that the services provided were insufficient, when in fact he did not avail himself of the opportunities provided to him during these proceedings. *See In re S.E.*, 15 N.E.3d 37, 48 (Ind. Ct. App. 2014) (affirming termination of mother's parental rights based on her non-compliance with multiple service referrals to address her mental health issues), *trans. denied.*

# Conclusion

[22] Father waived his Due Process argument by failing to raise it before the trial court. Waiver notwithstanding, the trial court's unchallenged findings demonstrate that DCS did attempt to address all of Father's issues, even with multiple referrals to some services, and that Father had the ability but not desire to benefit from those referrals. Accordingly, we affirm.

[23]    Affirmed.

Robb, J., and Vaidik, J., concur.