# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 21 2018, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander L. Hoover
Law Office of Christopher G. Walter, P.C.
Nappanee, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of De.F., Dy.F., A.F., & J.F. (Minor Children) and D.B.F. (Father) and J.S. (Mother);

D.B.F. (Father) & J.S. (Mother),

*Appellant-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

March 21, 2018

Court of Appeals Case No.
75A03-1708-JT-1883

Appeal from the Starke Circuit Court

The Honorable Kim Hall, Judge

Trial Court Cause No.
75C01-1702-JT-7
75C01-1702-JT-8
75C01-1702-JT-9
75C01-1702-JT-10

**May, Judge.**

[1] D.B.F. ("Father") and J.S. ("Mother") (collectively, "Parents") appeal the involuntary termination of their parental rights to De.F., A.F., Dy.F., and J.F. (collectively, "Children"). Parents argue the trial court's findings do not support its conclusions that the conditions under which Children were removed from their care would not be remedied and that termination was in Children's best interests.[1] We affirm.

# Facts and Procedural History

[2] Mother and Father are the parents of De.F., born April 22, 2004; A.F., born May 2, 2007; Dy.F., born March 23, 2013; and J.F., born December 3, 2015. On July 6, 2015, the Department of Child Services ("DCS") received a report that then-three-year-old Dy.F. "was standing outside on a window ledge - um - in an open window wearing a dirty diaper and dirty t-shirt - uh- yelling for his mother on the street." (Tr. at 14-15.) DCS arrived at the home to investigate, but no one was home. DCS returned the next day, and the family was present at that time.[2]

---

[1] Parents also assert the evidence was insufficient to support the trial court's conclusion the continuation of the parent-child relationship posed a threat to Children's well-being. We need not, however, address that argument. *See infra* n.5.

[2] At the time, only De.F., A.F., and Dy.F. were present at the home, as Mother was pregnant with J.F. We refer to De.F., A.F., and Dy.F. collectively as "Older Children."

[3]     DCS observed the home "was very much in disarray." (Tr. at 16.)  Regarding the state of the house, the trial court found:[3]

> The DCS case manager observed and photographed the following conditions of [sic] of the home: home lacked gas and electric utilities; a leaking roof; pots and buckets through the home to catch the rain water; carpet was wet, black and covered with mold; the kitchen was extremely dirty, the frying pans on the stove had food stuck to them, the stove was black, and there were dirty dishes and clutter throughout the kitchen; the children's bedroom was full of clutter, clothing and debris, the children's bed did not have sheets and the mattress was stained; the bathroom had mold, dirt, garbage, and an empty beer can, the toilet had brown water in it, and the bathtub was filled with dirty water and a fish that was caught the previous week; the ceiling had water stains, mold and portions were caving in.

(Appellants' App. Vol. II at 24.)  Additionally, DCS presented evidence "the children were dirty and appeared to be covered in bug bites." (*Id*.)  The Family Case Manager ("FCM") testified the level of uncleanliness exhibited by children "wasn't normal . . . it was like several, several days of playing outside dirty." (Tr. at 19.)  A doctor later diagnosed Older Children with scabies.  DCS removed Older Children from Parents' care on July 7, 2015.

[4]     On July 9, 2015, DCS filed petitions alleging each of the Older Children was a child in need of services ("CHINS").  Parents began preliminary services, such

---

[3] Unless otherwise indicated, the findings quoted are from the order concerning De.F., as the findings regarding the state of the home and Parents' actions are virtually identical in each order.

as parenting education and home-based services, prior to the trial court's hearing regarding the CHINS petitions. Parents started supervised visitation with Older Children on July 21, 2015. On July 23, 2015, the FCM was summoned to the foster home because De.F. "became physically aggressive" with A.F. (*Id.* at 46.) The next day, the foster parents again asked the FCM come to their house because De.F.:

> had gotten physically aggressive with one of the younger kids. . . . was standing on the hood of the van that belonged to the foster parents. The two (2) younger children were locked inside the vehicle for their safety because he had been threatening them - um - and there was a Sheriff's deputy present as well.

(*Id.* at 47.) The FCM and the foster father took De.F. to Michiana Behavior Health, a "psychiatric hospital." (*Id.*) De.F. was admitted to Michiana Behavior Health about a week later, and he stayed there for approximately ten days. During that time, De.F. was diagnosed with oppositional defiant disorder and mood disorder.

[5] In late July 2015, the FCM visited Parents' home and noted some improvement in the clutter. Father told the FCM he knew what needed to be repaired in the home in order for the Older Children to come home. In August 2015, the home caught fire and sustained water and smoke damage. On September 11, 2015, DCS provided a large dumpster for Parents to use to clean out the house. When the dumpster was removed a month later, it was not full.

[6] On October 6, 2015, Parents admitted Older Children were CHINS, specifically admitting "to all the allegations about the state of the home." (*Id.* at 42.) Based thereon, the trial court adjudicated Older Children as CHINS. On November 5, 2015, the trial court entered dispositional orders for Older Children, ordering Parents to complete certain services, including: obtain and maintain appropriate housing; complete family functioning and parenting assessments and follow all recommendations; refrain from the use of drugs or alcohol and submit to random drug screens; participate in home-based case management services; and participate in supervised visitation with Older Children.

[7] In late November or early December 2015, Parents found a new house to live in. DCS planned to assist Parents with the payment of rent. For DCS to do so, Parents were required to pick up certain paperwork. Parents did not pick up the paperwork. On December 3, 2015, Mother gave birth to J.F. On December 9, 2015, Parents were evicted from their house for failure to pay rent. DCS allowed J.F. to stay with Parents on the condition Mother live with maternal grandparents.

[8] DCS filed a petition alleging J.F. was a CHINS based on the family's living situation on December 29, 2015, but did not remove J.F. from Mother's care because she was living with maternal grandparents. On January 2, 2016, DCS removed J.F. from Parents' care "due to concerns for Mother's possible mental instability, Father's alcohol use, [Parents'] refusal to complete the clinical assessment, and Mother was involved [sic] in a dispute with the maternal grandparents the prior evening and left [sic] the home in the middle of the night

with [J.F.]." (Appellants' App. Vol. II at 59.) On February 2, 2016, the trial court adjudicated J.F. a CHINS after Parents admitted to the allegations in DCS's petition. The trial court's dispositional decree for Parents had the same requirements as those of Older Children because Parents "hadn't completed anything" the trial court had previously ordered. (Tr. at 56.) In addition, the trial court ordered Father to complete a substance abuse assessment.

[9] Mother completed her initial clinical assessment in January 2016. Father completed his initial clinical assessment in February 2016. Father met soon thereafter with the homebased counselor; Mother started therapy recommended from her initial clinical assessment in May 2016. Mother did not successfully complete the recommended therapy, and both Parents failed to "follow through with goals." (Appellants' App. Vol. II at 28.). Parents completed their parenting assessments in February 2016 and completed the recommended parenting classes soon thereafter. However, DCS did not feel they applied what was taught, so DCS referred Parents to another provider. In August 2016, Parents moved into a new house. DCS assisted Parents financially by paying for the security deposit and first month's rent. Another community organization supplied Parents with furniture.

[10] Parents visited regularly with Children, though they were consistently fifteen to thirty minutes late to every visit. The visitation supervisor observed "[Children] were free to do what they wanted; [Parents] had difficulty controlling [Children]; there was no co-parenting between Mother and Father; Mother and Father lacked communication and support for each other's parenting decision

[sic]; and [De.F.] was argumentative and aggressive toward the other children during visitation." (*Id.* at 29.) Because of Parents' tardiness to visitation, Parents "were told that if they were more than 15 minutes late to a visit, then the visit would be cancelled." (*Id.*) The visitation supervisor cancelled two visits because Parents were tardy. Parents continued to be tardy, but were never more than fifteen minutes late. One visit additional was "cancelled due to concerns that Father was intoxicated." (*Id.*)

[11] The FCM visited Parents' home in February 2017. He testified:

> When I went to the house in February, it was – uh – uh – pretty messy. Uh – there were lots of miscellaneous items on the floor. There were – uh – piles of miscellaneous items in the corner of the house. There was – um – I wouldn't say – um – like trash-trash, it would be like maybe wads – wads of pieces of paper thrown or – uh – pieces of plastic just laying on – around the floor – um – there was – uh, a little bit of – uh, overflowing garbage in the kitchen and there was – uh – a lot of beer cans in the house. And I – uh – after that we had the conversations about – uh – cleaning the home and reducing the clutter in the house as well.

(Tr. at 84.) The FCM also noted Parents did not have appropriate bedding for Children. DCS filed a petition for termination of Parents' rights to Children on March 2, 2017.

[12] On March 15, 2017, police arrested Mother after she allegedly shoplifted eight energy drinks; those charges were pending at the time of the termination hearings. The trial court held fact-finding hearings on the termination petitions

on June 6 and June 20, 2017.  The trial court issued orders terminating Parents'
rights to Children on July 20, 2017.

# Discussion and Decision

[13]    We review termination of parental rights with great deference.  *In re K.S., D.S.,
& B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).  We will not reweigh
evidence or judge credibility of witnesses.  *In re D.D.*, 804 N.E.2d 258, 265 (Ind.
Ct. App. 2004), *trans. denied*.  Instead, we consider only the evidence and
reasonable inferences most favorable to the judgment.  *Id*.  In deference to the
juvenile court's unique position to assess the evidence, we will set aside a
judgment terminating a parent's rights only if it is clearly erroneous.  *In re L.S.*,
717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied*
534 U.S. 1161 (2002).

[14]    "The traditional right of parents to establish a home and raise their children is
protected by the Fourteenth Amendment of the United States Constitution."  *In
re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*.  A trial court must
subordinate the interests of the parents to those of the children, however, when
evaluating the circumstances surrounding a termination.  *In re K.S.*, 750 N.E.2d
at 837.  The right to raise one's own children should not be terminated solely
because there is a better home available for the children, *id*., but parental rights
may be terminated when a parent is unable or unwilling to meet parental
responsibilities.  *Id*. at 836.

To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment.

*Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[17] Parents challenge the court's conclusions the conditions under which Children were removed would not be remedied, the continuation of the parent-child relationship posed a risk to Children, and termination was in the best interests of Children. Parents do not challenge any specific findings of fact, and therefore we accept the trial court's findings as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct."). Thus, we move to the second part of the analysis - whether the findings support the trial court's judgment.

### Reasonable Probability Conditions Would Not Be Remedied

[18] The trial court must judge a parent's fitness to care for the child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that the conditions will not change. *Lang v. Starke Cnty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[19] When assessing a parent's fitness to care for a child, the trial court should view the parents as of the time of the termination hearing and take into account the

changes that have occurred during the proceedings. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. However, the trial court must also "evaluat[e] the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of [a] child." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*.

[20] Here, regarding whether the conditions under which Children were removed from Parents' care would be remedied, the trial court found:

> a. The conditions that resulted in [Older Children's] removal on July 9, 2015 were deplorable home conditions. The home was located [at Address 1].[4]

> b. In August 2015, the home caught fire, which resulted in smoke and additional water damages to the home. The Starke County Health Department determined that the home was not in a habitable condition due to the leaking roof, water and mold damage, fire and smoke damage, structural damage and weak flooring. Mother and Father decided that they wanted to repair the home because Mother owned the home and it had sentimental value to her.

> c. On September 11, 2015, DCS rented a large dumpster for Mother and Father to assist with cleaning and removing clutter from the home. The dumpster was delivered on September 15, 2015. DCS informed Mother and Father that they would have the dumpster for 10 days and could fill it twice. The dumpster

---

[4] To maintain confidentiality of the proceedings, we will reference the home the family lived in at the time of Older Children's removal as "Address 1" and the home Parents lived in at the time of the termination hearing as "Address 2."

was removed on or about October 14, 2015, one month later, and was never filled.

d. Mother and Father were unsuccessful with repairing the damages to the home at [Address 1] and sought alternative housing. In late November/early December 2015, Mother and Father informed DCS that they located a new home. DCS planned to assist with the first month's rent and informed Father that the necessary paperwork for the landlord was ready for Father to pick up at the DCS office. Mother and Father never picked up the forms. On December 9, 2015, Mother and Father had to leave the home due to nonpayment of rent.

e. In August 2016, Mother and Father moved to [Address 2]. DCS assisted [Parents] financially and Keys Counseling supplied furniture. On August 26, 2016, DCS paid $1,000.00 for the security deposit and first month's rent. DCS also paid $1,000.00 toward the back due NIPSCO bill for utilities, which was outstanding since September 2014. Mother and Father had $19.27 left to pay on the outstanding NIPSCO bill in order for the utilities to be turned on in the home. From August 2016 to the Permanency Hearing on October 25, 2016, [Parents] failed to pay the remainder and the home continued to lack utilities. At that time, Father received social security disability and [Mother] was in the process of appealing her social security disability denial. Mother was unemployed.

f. The Court suspended services and visitation at the October 25, 2016 Permanency Hearing.

g. Mother and Father continue to reside at [Address 2]. On February 16, 2017, the DCS case manager visited the home. The case manager observed the home to have working utilities, very little food, and piles of random items in the corners of rooms,

clutter in the home, overflowing garbage, and many beer cans. The bathroom was appropriate.

h. The DCS case manager made an unannounced visit to the home on June 5, 2017 and observed and photographed the home. The case manager found the home to have working utilities and plenty of food. The case manager was concerned with the amount of clutter. The clutter remained in the home but was relocated to different spots such as the corners of the rooms, the children's beds and the baby's crib. The case manager found the home to be cleaner but was worried about the following: where [Children] would sleep; where the parents would put all of the items currently stacked on the beds; and where would the parents put the [Children's] clothing and belongings once they returned to the home. The Mother and Father were unable to reduce the clutter in the home.

i. Mother sold the property located at [Address 1] for approximately $4,500.00. Mother states that she currently has approximately $2,000.00 left from the sale of the home.

j. Mother states that she was approved for social security disability for degenerative disc disease within the last month.

k. On March 15, 2017, Mother was arrested for conversion when she allegedly stole eight (8) 5-hour energy drinks from 5-Star grocery store. Mother is now banned from the local grocery store. Mother states that she will shop at Save-a-lot and Walmart.

l. [Mother] has a license and has a car. [Father's] license is suspended for life.

m. Mother and Father were ordered to participate in services under the Dispositional Decree entered on October 27, 2015 as follows: [outlining requirements set forth in trial court's Dispositional Decrees.]

n. Mother and Father were repeatedly provided with clear, understandable guidance from the Court, DCS, CASA and service providers regarding what was necessary for [Children] to return to the care of [Parents]. Mother and Father did not make significant progress in services, obtaining a suitable home or the ability to safely parent [Children] in order to successfully reunify.

    i. Mother and Father completed the clinical assessment on January 5, 2016. Mother began attending the recommended therapy sessions in May 2016 with Keys Counseling but was not successfully discharged from the service. Father and Mother sporadically met with the recommended home based case worker, but there was no follow through with goals.

    ii. Mother and Father completed the family functioning assessment and parenting assessment on February 12, 2016. Mother and Father attended and completed parenting education through Porter Starke but did not apply the learned skills until Fall 2016. Parenting education was also provided as part of the supervised visitations through Keys Counseling. Conrad Angon began working with the family in the summer of 2016. He observed the following during his first visit with the family: that [Children] were free to do what they wanted; parents had difficulty controlling [Children]; there was no co-parenting between Mother and Father; Mother and Father lacked communication and support for each other's parenting decision [sic]; and [De.F.] was argumentative and aggressive toward the other children during visitation.

According to Mr. Angon, Mother and Father had difficulty with timeliness for visitation. Mother and Father would be 25-30 minutes late for visitation because they were preparing meals for the children. A Child and Family Team Meeting (CFTM) was held to address the tardiness and parents were told if they were more than 15 minutes late to a visit then the visit would be cancelled. Following the CFTM, two visits were cancelled because Mother and Father were more than 15 minutes late. Mr. Angon stated that [Parents] were never on-time [sic] for the rest of visitations, but they would make it prior to the 15 minutes. Another visit was cancelled due to concerns that Father was intoxicated.

Keys Counseling Owner/CEO and Mr. Angon scheduled another meeting with Mother and Father to address arguing between [Parents] during visit [sic], the need for co-parenting, tardiness, and Father's alcohol use. At the meeting [Father] admitted that he had a drinking issue and that he wanted to address it. [Mother] admitted that she relies on Father for everything and understood that Father has a hard time balancing the decision making for everyone during the visitation. Mother needed to be more independent and [Parents] needed to work together to parent [Children]. Mr. Angon worked on the [Parents'] relationship and co-parenting techniques following visitation.

[Parents] would provide [Children] sugar snacks, chips, and caffeine beverages. This resulted in increased hyperactivity for [Children] and added conflict to the visitation. [Parents] did not understand the correlation between the snacks provided and [Children's] behavior. In addition, Mother would feed [J.F.] table food like ice cream and spaghetti, rather than adhering to the pediatrician recommended formula diet. The visit supervisor addressed age appropriate food for [J.F.] and sugar intake for [Older Children].

Mother and Father were receptive to services, but were unable to have a pattern of consistently implementing the learned skills.

o. Child and Family Team never reached a point where it was safe for [Children] to return to the home, even for supervised visitation. The home conditions of [Address 2] were greatly improved from the home conditions at [Address 1]; however, the home lacked utilities from the time [Parents] obtained it in August 2016 until the October 25, 2016 Permanency Hearing. At that point, [Children] had been out of the home for 15 consecutive months and there was no recommendation or indication that [Children] would be able to return in the near future. Mother and Father have maintained the home at [Address 2] but refused [sic] to address the issue of clutter in the home.

p. The Mother and Father participated in services and obtained a new home but did not change their behavior. [Parents] have not addressed the reasons that led to the family home on [Address 1] getting to the deplorable conditions that it was in on July 6, 2015. [Parents] have not shown progress with services or the current home on [Address 2] that would lead the Court to believe that the home would be a safe, clean, stable home environment for [Children].

(Appellants' App. Vol. II at 25-30) (footnote added).

[21]     Parents argue the trial court's findings and conclusions ignore the progress they made during the pendency of these proceedings, specifically that the visitation supervisor testified Parents were on track to begin unsupervised visits when the permanency plan changed from reunification in October 2016; that no providers expressed concerns about Parents' ability to retain their current

residence or have sufficient financial security to support Children; and the condition of Parents' residence at the time of the termination hearing was greatly improved from that of the residence at the time Children were removed from their care. These arguments are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court does not reweigh evidence or judge the credibility of witnesses). The trial court's findings support its conclusion that the conditions under which Children were removed from Parents' care would not be remedied.[5] *See In re Involuntary Termination of Parent Child Relationship of A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005) ("A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions" supports the conclusion there is not a reasonable probability conditions will be remedied).

### Best Interests of Children

[22] In determining what is in Children's best interests, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*.

---

[5] The trial court found the conditions under which Children were removed would not be remedied and the continuation of the parent-child relationship posed a threat to Children. DCS does not have to prove both because the statute is written in the disjunctive, such that DCS must prove either by clear and convincing evidence. *See* Ind. Code § 31-35-2-4(b)(2)(B). Because the findings support the conclusion there was a reasonable probability conditions leading to Children's removal would not be remedied, we need not address whether the findings also support a conclusion that the continuation of the parent-child relationship posed a threat to Children's well-being. *See In re L.S.,* 717 N.E.2d at 209 (because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, court needs to find only one requirement to terminate parental rights).

A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in Children's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[23] The trial court concluded Children were thriving in foster care. Specifically, the trial court found, regarding De.F.:

> [De.F.'s] behaviors are stable and according to his therapist, [De.F.] has grown and achieved so much since his removal from Mother and Father. When the therapist began working with [De.F.] in October 2015, he found [De.F.] to lack social skills, lack skills of asking permission prior to acting, was destructive to property, was very disrespectful toward women, and struggled educationally with regards to reading, knowing days of the week, concept of time, and difference between left and right. Since [De.F.'s] removal, [De.F.] developed emotionally and physically. [De.F.] now has confidence, doesn't feel the need to worry about the care of his siblings, respects authority figures, has self-control and is well behaved, and has greatly improved with reading and cooperates with school and homework. [De.F.] has learned basic functions that he initially lacked, such as proper social interactions, getting permission from adults, and the value of earning money through chores and spending it on something that is important to him. The therapist believes that Child requires stability, and parents that are able to provide structure, set boundaries and expectations, and provide nurturing and support. Mother and Father love [De.F.] but are unable to provide the

home environment that [De.F.] requires to thrive. [De.F.] needs permanency.

(Appellants' App. Vol. II at 31.) Regarding A.F., the trial court found:

Since [A.F.'s] removal from Mother and Father he has made a substantial improvement with his education and behavior. [A.F.] repeated the 3rd grade because he did not pass the IREAD test. According to his teacher, Ms. Biggs, [A.F.'s] reading level was 1st grade, 6 months. Ms. Biggs worked with [A.F.] for both 3rd grade years. The initial observations Ms. Biggs had of [A.F.] were that he was introverted, would not smile, had problems making friends, would push kids and use profanity, had gaps in his learning and no cognitive, physical or mental, delay. At the end of the 2016-2017 school year, Ms. Biggs reported [A.F.] to be a completely different child that has blossomed. [A.F.] easily makes friends, is well liked by his peers, no longer uses profanity, is no longer pushing or shoving on [sic] recess, is on the A/B honor roll, and is excited about school. Ms. Biggs believes that [A.F.'s] success and fast turn-around with his education is due to [A.F.'s] current home environment. [A.F.] now has a home environment that has consistency, stability, structure, rules and consequences, caring, and caregivers that believe education is important.

[A.F.'s] therapist began working with him in February 2016 to address defiance, trauma, and problematic behaviors in the home. The therapist is a female and struggled in sessions with [A.F.] initially because [A.F.] was disrespectful toward women and didn't think he needed to listen to women or authority figures. The therapist worked with [A.F.] on respect and [A.F.] has learned to accept consequences rather than fight them. [A.F.] would exhibit negative behaviors following visitation with parents because he would state that Mother and Father said he didn't have to listen to the foster parents. [A.F] initially asked the therapist repeatedly when he could return home; however,

over the last 6 months, he has stated that he wants to remain in his current home. The therapist has observed [A.F.] to now have a positive attitude, respect and is content in his current home. The therapist believes that his current environment is positive for [A.F.] because it provides structure, love and support. Mother and Father love [A.F.] but are unable to provide the home environment that [A.F.] requires to thrive. [A.F.] needs permanency.

(*Id.* at 52-3.) Regarding Dy.F.,[6] the trial court found:

[Dy.F.] was removed at 2 years of age and is now 4 years of age. [Dy.F.] has spent half of his life out of the care of the Mother and Father. At the time of removal, [Dy.F.] had very little [sic] verbal skills. [Dy.F.] now speaks [in] full sentences and is able to recognize basic colors and shapes. [Dy.F.] also had severe tooth decay at the time of removal and needed oral surgery to restore and protect his teeth. [Dy.F.] is in a home that can provide a safe, stable, clean home environment that meets [Dy.F.'s] basic needs. Mother and Father love [Dy.F.] but are unable to provide the home environment [Dy.F.] requires to thrive. [Dy.F.] needs permanency.

(Appellee's App. Vol. II at 9-10.) Regarding J.F., the trial court found:

[J.F.] has been out of the home for 17 months. [J.F.] is only 18 months old. [J.F.] has been out of the care of the Mother and Father for the majority of her life. To [J.F.], the foster parents are her parents and they have met all of her daily needs. [J.F.] is walking and talking, she is developmentally on track, and is

---

[6] The trial court issued an amended order regarding Dy.F. on November 21, 2017, after we granted DCS's motion to remand to correct the findings of the original order to reflect facts relevant to Dy.F., as the original order did not do so.

excelling in her current home. [J.F.] is in a home that can provide a safe, stable, clean home environment that meets [J.F.'s] basic needs. Mother and Father love [J.F.] but are unable to provide the home environment that [J.F.] requires to thrive. [J.F.] needs permanency.

(Appellants' App. Vol. II at 63-4.)

[24] Parents argue the trial court's findings regarding Children's progress while in foster care support a conclusion that termination is not in Children's best interest. Parents contend the foster parents' "more stable financial situation . . . [which enabled] the foster parents to provide a more stable environment that the children would have been more apt to thrive in . . . alone cannot constitute what is in the best interests of the children." (Br. of Appellants at 22.) We note the foster parents' ability to provide a stable and nurturing environment was not the only reason the trial court found termination was in Children's best interests. Children were thriving in foster care because they were in an environment where their developmental needs were being met regularly. Parents had not progressed to the point that they could provide an environment that could meet Children's needs, and that, when combined with the Children's need for permanency, supports termination being in the Children's best interests. Essentially, Parents are asking us to reweigh the evidence, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court does not reweigh evidence or judge the credibility of witnesses). We therefore conclude the trial court's findings support its conclusion that termination was in Children's best interests. *See S.E. v. Indiana Dept. of Child Servs.*, 15 N.E.3d 37, 47 (Ind. Ct. App.

2014) (evidence that child was thriving in foster care supported conclusion that termination was in child's best interests), *trans. denied.*

# Conclusion

[25] Parents do not challenge the evidence presented by DCS to support the trial court's findings. We hold the trial court's findings regarding whether the conditions under which Children were removed would not be remedied supported that conclusion, and the trial court's findings regarding the best interests of Children supported the conclusion that termination was in the best interests of Children. Accordingly, we affirm.

[26] Affirmed.

Vaidik, C.J., and Altice, J., concur.