## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 20 2019, 9:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Heather M. Schuh-Ogle
Thomasson, Thomasson, Long & Guthrie, P.C.
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of F.P., J.P., M.C., (Minor Children)

and

C.C. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

September 20, 2019

Court of Appeals Case No. 19A-JT-590

Appeal from the Bartholomew Circuit Court

The Honorable Kelly Benjamin, Judge

The Honorable Heather Mollo, Magistrate

Trial Court Cause Nos. 03C01-1709-JT-4847, -48, -49

**Crone, Judge.**

## Case Summary

[1]     C.C. ("Mother") appeals the involuntary termination of her parental rights to F.P., J.P., and M.C. ("Children").[1]  She argues that the trial court committed clear error in concluding that there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside the home will not be remedied and that termination is in the Children's best interests.  She also argues that she was denied due process after disposition in the children in need of services ("CHINS") case because she was not represented by counsel at subsequent CHINS hearings.  We conclude that the trial court's conclusions are clearly and convincingly supported by the unchallenged findings of fact and that Mother waived her due process claim by raising it for the first time on appeal.  Therefore, we affirm.

## Facts and Procedural History

[2]     The unchallenged findings of fact show that Mother is paralyzed from the waist down and uses a wheelchair as a result of being struck while riding a bicycle when she was eleven years old.[2]  M.C. was born in August 2013.  F.P. and J.P. are twins born in December 2014.

---

[1] F.P. and J.P.'s father executed consents for their adoption.  M.C.'s father's parental rights were terminated in the same order as Mother's, but he does not appeal.

[2] Mother received a $200,000 settlement from the accident, which is managed by a trustee.

[3]    On January 22, 2015, the Indiana Department of Child Services ("DCS") received a report that the Children were abused and/or neglected due to unsafe sleeping and feeding conditions in Mother's home. Appealed Order at 2 (Finding #7). At that time, F.P. and J.P.'s father ("Father") lived with the family. On January 26, 2015, DCS Family Case Manager ("FCM") Amy Pawlus visited Mother's home. Pawlus smelled rotting food, dirty diapers, and urine and "observed garbage bags overflowing, sharp items within reach of the Children, excessive flies in the home, flies on baby bottles, and formula spoiling." *Id*. at 3 (#8). Pawlus also observed F.P. and J.P. "being fed with propped up bottles in their cribs without proper supervision."[3] *Id*.

[4]    On February 13, 2015, Pawlus visited the home again and found that conditions remained substantially the same; some of the same dishes, food, and garbage bags that Pawlus had seen at the earlier visit were still present. *Id*. (#9). Also, F.P. and J.P. were asleep in their cribs with bottles propped up for feeding. *Id*. Crusted formula was in their hair, and flies were on their faces and bottles. *Id*. Mother was indifferent and unconcerned about the feeding and sleeping practices. *Id*. (#10). Initially, Mother was offered a program of informal adjustment, but no improvement was observed. *Id*. (#11). During March 2015, Pawlus never observed the home in a condition that was safe for

---

[3] The bottles contained eight ounces of formula, contrary to the doctor's order for two ounces of formula per feeding. Tr. Vol. 2 at 49.

the ages of the Children. *Id.* M.C. was mobile, but there was rotting food on the floor, and there were sharps containers within her reach with openings large enough for her hand. *Id.* The Children were often seen wearing the same urine-soaked clothing.[4] *Id.*

[5] On March 19, 2015, the Children were removed from Mother's care. On March 22, 2015, DCS filed a petition alleging that the Children were CHINS. Mother admitted that she was struggling to care for the Children and the home, there was a buildup of garbage, dirty dishes, and dog feces,[5] the home was not appropriate for the Children in its present state, and the Children were CHINS. *Id.* (#16). The dispositional order required Mother to participate in home-based case management, a parenting curriculum, and supervised visitation with the Children. Initially, Mother had supervised visitation with the Children for two hours three times a week.

[6] After removal from Mother's home, the Children were placed in foster care. When they first arrived at their foster home, "they were physically dirty, had an odor, did not like to take baths, and struggled to sleep at night." *Id.* at 11

---

[4] Pawlus testified that the Children were dirty, and their clothes usually smelled of and were soaked in urine. Tr. Vol. 2 at 59. She also testified that the smell from the rotting food, garbage, dirty diapers, and urine was "overpowering." *Id.* at 53.

[5] The presence of dog feces appears to apply to the Children's grandmother's home, which was attached to Mother's home.

(#90). M.C. and J.P. were evaluated by First Steps.[6] M.C. "was found to be globally deficient and required developmental therapy, occupational therapy, and physical therapy." *Id*. at 10 (#88). M.C. "quickly made progress and completed services within two months." *Id*. J.P. was diagnosed with torticollis and required physical therapy for a longer period of time.[7] *Id*. (#89). While in foster care, the Children "started hitting their developmental milestones." *Id*. at 11 (#92).

[7] DCS providers determined that Mother had problems with anxiety and depression, which affected her daily living, and offered her individual therapy. *Id*. at 4 (#6). From July 2015 to June 2017, Jeannie Arbuckle served as Mother's individual therapist. *Id*. (#7). Arbuckle used several therapeutic techniques to help Mother, but Mother saw them as chores, and there was not much progress. *Id*. (#8). In early 2016, Arbuckle recommended that, in addition to therapy, Mother seek medication management for her depression and anxiety. *Id*. at 5 (#14). Mother agreed, but her regularity in taking the medication was questionable. *Id*. (#15).

[8] In the early months of the case, Mother was able to improve the conditions of the home. Sometime between March 14 and June 28, 2016, the Children had

---

[6] First Steps is a program administered by the Indiana Family and Social Services Administration for children under the age of three who are experiencing developmental delays. IN.gov, FSSA: First Steps Home, https://www.in.gov/fssa/4655.htm (last visited Sept. 3, 2019).

[7] Torticollis is "a tightening of the neck muscle" and apparently caused J.P.'s head to tilt in one direction. Tr. Vol. 2 at 98.

their first overnight visitation with Mother. *Id.* at 6 (#30). During that visit, Mother violated the Children's safety plan by leaving one of the Children asleep on a changing table. *Id.* "It was particularly troubling to have these incidents still occurring one year after the opening of the CHINS case despite home based services and a safety plan." *Id.* Afterward, DCS resumed supervised visitation.

[9] Over the course of 2016, safety conditions in the home had to be continually addressed. Prescription bottles and inhalers were left within reach of the Children. *Id.* (#31). The Children's training potty was not properly emptied, with fecal matter and urine left unattended. *Id.* There was exposed wiring near the Children's cribs, and a heavy headboard leaning against a dresser. The Children were seen eating food off the floor. *Id.* "Used diapers were left unattended and the house smelled of urine." *Id.* (#32). In November 2016, DCS recommended that Mother hire a cleaning service. *Id.* (#33). For six months, DCS "worked in earnest to assist Mother" with hiring a cleaning service. *Id.* Finally, a deep clean was scheduled for March 2017, but it never occurred. *Id.*

[10] On March 22, 2017, the Children began a trial home visit with Mother. However, after two and a half months, the Children were removed due to numerous concerns for their safety and well-being: the condition of the home deteriorated and was unsafe, with dishes piling up and latex gloves and exposed wiring within the Children's reach; Mother failed to remediate safety issues in a timely manner; the Children appeared unkempt; the Children displayed increased aggression, with hitting, screaming, and biting; there was a lack of

physical contact or emotional warmth from Mother toward the Children; the Children sought each other out for comfort rather than Mother; the Children were left unattended in the bathtub; two of the Children got out of the house and into the street unattended because Mother "forgot to lock the door"; Mother quit trying to have the Children take naps; there appeared to be no routine; and M.C. required a short hospital stay for a health issue that may have been a psychosomatic symptom due to stress. *Id*. at 7-8 (#38-54). Also, during the trial home visit, J.P. was engaged in a physical therapy program for a delay in walking and balance. However, Mother did not seem interested in participating, and it was not until J.P. was returned to foster care that she made sufficient progress to be successfully discharged from therapy. *Id*. at 7 (#37). In addition, there was an instance of domestic violence, during which Father physically assaulted the Children's grandmother, Mother held a ten- to twelve-inch knife against Father's throat, and one of the Children got pushed down. *Id*. at 8-9 (#56). After the incident, Father moved out of Mother's home.

[11] On June 6, 2017, the Children were removed from Mother's care and returned to foster care, and supervised visitation resumed. During visitation, "Mother required frequent prompting … regarding safety concerns" and "did not consistently implement recommendations from providers that were crucial to child safety and often blatantly ignored prompts from providers." *Id*. at 11 (#101). The Children became reluctant to visit Mother and verbally expressed that they did not want to attend visits. *Id*. at 12 (#106). F.P. physically resisted attending a visit, and J.P. was "hard to console when she understood that a visit

with Mother was going to occur." *Id*. M.C. "displayed a stress response of needing to immediately go to the bathroom at the start of a visit with Mother." *Id*. During visitation, "Mother put her own needs before those of the Children" and "required prompting to interact with the Children in a warm and loving manner." *Id*. (#105). "Mother was unwilling to implement changes in her parenting and became frustrated when things [did] not go her way." *Id*. at 11 (#103). By September 2017, the Children's therapist recommended that visitation be discontinued due to the level of distress it caused the Children. *Id*. at 12 (#107). The trial court reduced visitation to one hour per week and set a status hearing for six weeks to give Mother time to make positive changes. *Id*. However, supervised visits never progressed beyond one hour per week. *Id*. (#108). Mother had opportunities to attend the Children's appointments with medical providers but attended less than half. *Id*. at 9-10 (#69, 73). For example, she missed F.P. and J.P.'s two-year physical. *Id*. at 9 (#70). According to Mother, she failed to attend the Children's appointments because she slept late due to her depression, forgot, or had conflicts. *Id*. at 10 (#73).

[12] After the trial home visit, domestic violence and safe relationships were added to Mother's treatment goals in therapy and case management. *Id*. at 9 (#58). Despite this counseling, Mother became a pen pal with a person who was incarcerated and planned to have him move into her home when he was

released.[8]  *Id*. (#63).  "Even after Mother was cautioned that unhealthy romantic relationships could delay reunification with the Children, she visited the pen pal in jail."  *Id*. (#64).

[13]  In July 2017, Arbuckle stopped serving as Mother's therapist.  At the time Arbuckle stopped therapy, "Mother was still working on the same initial goals in therapy – anxiety, depression, coping strategies, and routines."  *Id*. at 5 (#16).  From September 2017 to December 2017, Mother had individual therapy with Cathy Gentry.  *Id*. (#21).  Gentry diagnosed Mother with major depressive disorder.  *Id*. (#22).  Gentry's primary goal of therapy was for "Mother to learn how to take care of herself before taking care of the Children."  *Id*. (#23).  Gentry "found Mother to be receptive to therapy, but that she lacked follow through."  *Id*. (#26).  Mother typically failed to complete assigned goals, and failed "to create a schedule for herself so that she would not sleep all day."  *Id*. (#26-27).  When Gentry stopped therapy with Mother, "Mother had not progressed to the point of being able to take care of herself," and Gentry had concerns for the Children's safety if they were returned to Mother.  *Id*. at 6 (#28).  In January 2018, Lee Hamlin became Mother's therapist.  *Id*. at 10 (#78).  After an initial meeting, Mother failed to attend a scheduled appointment and cancelled the next two appointments.  *Id*. (#79-80).

---

[8]  The inmate was in prison on a drug-related conviction, including possession of methamphetamine.  Ex. at 45.

[14]     On September 6, 2017, DCS filed petitions for the involuntary termination of the parent-child relationships. On March 23 and May 18, 2018, the trial court conducted an evidentiary hearing. The Children's therapist supported the Children being adopted by foster parents based upon the bonds and attachments of the Children. *Id*. at 12 (#109). The Children's current court appointed special advocate ("CASA") also supported adoption of the Children by the foster parents and believed "visits with Mother were a disruption to the Children's lives." *Id*. at 13 (#114, 122). Three different family case managers opined that "it would be detrimental to the Children from a psychological and emotional standpoint to continue efforts of reunification with Mother." *Id*. (#117). "The detrimental harm is the combination of Mother struggling to understand age appropriate parenting and development, Mother's lack of nurturing and inability to comfort, Mother's lack of self-care and inability to be fully present as a parent, and an ongoing inability to maintain safe living conditions for the Children." *Id*. On February 11, 2019, the trial court issued findings of fact and conclusions thereon, terminating Mother's parental rights to the Children. This appeal ensued.

## Discussion and Decision

[15]     Mother seeks reversal of the termination of her parental rights. In considering her appeal, we recognize that "a parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (quoting *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)). "[A]lthough

parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008). Involuntary termination of parental rights is the most extreme sanction, and therefore "termination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.*

[16] Because "the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children," we apply a heightened standard of review to termination proceedings. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016) (quoting *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014)).

> In considering whether the termination of parental rights is appropriate, we do not reweigh the evidence or judge witness credibility. We consider only the evidence and any reasonable inferences therefrom that support the judgment, and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. [Ind. Trial Rule 52(A)]. In evaluating whether the trial court's decision to terminate parental rights is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment.

*K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229-30 (Ind. 2013) (citations and quotation marks omitted).

A petition to terminate a parent-child relationship involving a CHINS must, among other things, allege:

> (B) that *one* (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code § 31-35-2-4(b)(2) (emphasis added). DCS must also allege that termination is in the best interests of the child. Ind. Code § 31-35-2-4(b)(2)(C). DCS must prove each element by "clear and convincing evidence." *R.S.*, 56 N.E.3d at 629; Ind. Code § 31-37-14-2. If the trial court finds that the allegations in the petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

**Section 1 – The trial court did not clearly err in concluding that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside Mother's home will not be remedied.**

[18]   Mother asserts that "[t]he trial court committed error when it failed to show by clear and convincing evidence" that there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside Mother's home will not be remedied. Appellant's Br. at 18. Initially, we observe that DCS, not the trial court, has the burden of proving the elements required under Section 31-35-2-4 by clear and convincing evidence. We further note that even though Mother's argument refers to the sufficiency of the evidence, Mother has not directly challenged any of the trial court's findings. When findings of fact are unchallenged, this Court accepts them as true. *In re S.S.*, 120 N.E.3d 605, 608, n.2 (Ind. Ct. App. 2019). As such, if the unchallenged findings clearly and convincingly support the judgment, we will affirm. *Kitchell v. Franklin*, 26 N.E.3d 1050, 1059 (Ind. Ct. App. 2015), *trans. denied*; *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*.

[19]   In reviewing whether there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside Mother's home will not be remedied, we engage in a two-step analysis. *K.T.K.*, 989 N.E.2d at 1231. First, "we must ascertain what conditions led to placement and retention in foster care." *Id.* Second, we "determine whether

there is a reasonable probability that those conditions will not be remedied." *Id.* (quoting *In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)). When the trial court makes its determination, it must evaluate a parent's fitness at the time of the termination hearing, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). In addition, a trial court may consider services offered by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish 'that there is a reasonable probability that the parent's behavior will not change.'" *A.D.S.*, 987 N.E.2d at 1157 (quoting *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)).

[20] Here, the conditions that resulted in the Children's removal and placement outside Mother's home were Mother's failures to provide the Children with a safe environment. Mother contends that she made significant progress in improving the conditions of the home over the course of the CHINS case, the trial court's orders show that she made progress, and DCS's disapproval of the home conditions can be primarily attributable to a difference in housekeeping standards. Mother's argument emphasizes the improvements in the cleanliness of her home, but that was only one aspect of the home environment that was unsafe for the Children and led to their removal. The unchallenged findings of fact show that Mother's parenting significantly contributed to the creation of unsafe conditions. FCM Pawlus observed that one-month-old F.P. and J.P. were left unattended in their cribs to feed themselves with propped-up bottles, and obvious safety hazards such as Mother's sharps container were left within fifteen-month-old M.C.'s reach.

[21] Safe parenting remained an issue throughout the CHINS case. During the first overnight visitation the Children had with Mother in the spring of 2016, safety was an issue. After a year of services covering child safety and parenting, Mother allowed one of the twins to sleep on a changing table in violation of the Children's safety plan. Over the course of 2016, unsafe conditions in the home were a consistent problem: DCS providers observed prescription bottles and inhalers left within the Children's reach, exposed wiring, and fecal matter and urine left unattended in the training potty. Mother seemed not to recognize that

some conditions were a safety hazard to the Children, such as the headboard left leaning against a dresser.

[22] During the trial home visit from March 22 to June 6, 2017, Mother had two and a half months to practice safe parenting, strengthen the bond with her Children, and demonstrate that she was able to care for the Children and manage the home. However, the trial home visit had to be terminated due to safety and parenting issues. As for safety concerns, dangerous items were left within the Children's reach, Mother failed to timely remedy dangerous conditions, the Children were left unattended in the bathtub, and two of the Children got out of the house and into the street unattended. As for parenting concerns, there was a lack of emotional warmth from Mother toward the Children, the Children sought each other out for comfort rather than Mother, Mother did not seem interested in participating in J.P.'s therapy, the Children appeared unkempt, they were seen eating off the floor, and they displayed escalating aggression, including hitting, screaming, and biting. There was also a physical altercation when Father attacked the Children's grandmother, and Mother held a knife to his neck. Although Father left after the altercation, Mother pursued a relationship with an incarcerated individual even after she was counseled that unhealthy romantic relationships could delay reunification with the Children.

[23] Mother also failed to progress in her individual therapy. When Arbuckle stopped therapy with Mother in July 2017, Mother was still working on the same initial therapy goals. When Gentry stopped therapy with Mother in

December 2017, Gentry did not believe Mother had progressed to the point of being able to take care of herself, and Gentry had concerns for the Children's safety if they were returned to Mother. Another therapist met with Mother once in January 2018, but Mother missed the next appointment and cancelled two others.

[24] In addition to the lack of progress in safe parenting and individual therapy, Mother's relationship with the Children also deteriorated. This occurred even after the Children had lived with Mother for two and a half months during the trial home visit. Mother still "required frequent prompting during visits regarding safety concerns" and "did not consistently implement recommendations from providers that were crucial to child safety and often blatantly ignored prompts from providers." Appealed Order at 11 (#101). Mother put her own needs before the Children's and required prompting to interact with the Children in a loving manner. *Id*. at 12 (#105). Also, "Mother was unwilling to implement changes in her parenting and became frustrated when things [did] not go her way." *Id*. at 11 (#103). Eventually, the Children expressed reluctance to visit Mother. Due to the level of distress the Children experienced as a result of visitation, their therapist recommended that visits be reduced to one hour a week.

[25] The trial court's findings show that over the two and a half to three years that DCS had been providing services, Mother may have made progress in keeping her house relatively clean, but she was unable to parent in a way that maintained a safe, secure, and stable environment for the Children. We

conclude that the findings clearly and convincingly support the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal and the reasons for continued placement outside the home will not be remedied.[9]

## Section 2 – The trial court did not clearly err in concluding that termination of Mother's parental rights is in the Children's best interests.

[26] Mother also challenges the trial court's conclusion that termination of the parent-child relationship is in the Children's best interests.

> [I]n determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by [DCS] and to consider the totality of the evidence. In so doing, the trial court must subordinate the interests of the parent to those of the child. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) (citations omitted).

---

[9] Due to our resolution of this issue, we need not address Mother's argument that the trial court erred in concluding that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being.

Here, the CASA and the Children's therapist supported termination of parental rights and adoption by the foster parents, and three different family case managers opined that continued efforts toward reunification would be detrimental to the Children's psychological and emotional well-being. We have already concluded that there is a reasonable probability that the conditions that resulted in the Children's removal from Mother's care will not be remedied. Accordingly, we conclude that the trial court did not clearly err in concluding that termination is in the Children's best interests.

## Section 3 – Mother waived her claim that her due process rights were violated.

At the initial hearing in the CHINS case, Mother requested and was appointed counsel. Ex. at 6. At the conclusion of the dispositional hearing, Mother's counsel requested to withdraw his appearance. The record does not indicate the reason for the request. The trial court granted counsel's request but ordered that counsel "shall remain available should [M]other have any questions that arise during the progression of the case." *Id*. at 12. Mother did not appeal the dispositional decree.

On August 7, 2017, after the trial home visit ended and the Children were removed from Mother's care, Mother wrote a letter to the trial court requesting a public defender. On August 30, 2017, the trial court granted Mother's request and appointed public defender Christopher Clerc to represent Mother. On September 6, 2017, DCS filed the petitions for involuntary termination of the parent-child relationships. Mother did not file a motion to dismiss the

termination petition. At the evidentiary hearings on March 23 and May 18, 2018, Clerc appeared on Mother's behalf. Clerc did not raise the issue that Mother had not been represented by counsel throughout the CHINS proceedings. Mother now argues for the first time that failure to provide her with counsel through all stages of the CHINS proceeding violated her constitutional and statutory due process rights.

[30] It is well established that "a party on appeal may waive a constitutional claim, including a claimed violation of due process rights, by raising it for the first time on appeal." *In re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016). And "a parent may waive a due-process claim in a CHINS or termination proceeding by raising that claim for the first time on appeal." *S.E. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 37, 43-44 (Ind. Ct. App. 2014), *trans. denied*; *see also McBride*, 798 N.E.2d at 194 (affirming termination of parental rights and concluding that mother waived claim that her due process rights were violated by numerous alleged deficiencies in the CHINS proceedings because she did not raise the issue to the trial court); *In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (affirming termination of parental rights and concluding that mother waived due process claim that trial court violated her rights in failing to follow statutory requirements governing permanency hearings, case plans, and dispositional orders by raising issue for the first time on appeal). Mother could have raised her due process claim in a motion to dismiss or brought it to the trial court's attention during the termination proceedings. She failed to do so. Accordingly, she has waived her due process claim.

[31] Based on the foregoing, we affirm the termination of Mother's parental relationship to the Children.

[32] Affirmed.

Baker, J., and Kirsch, J., concur.