## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 03 2020, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel Hageman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:
CHILD ADVOCATES, INC.

Dede Kristine Connor
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: R'N.F. and R'S.F. (Minor Children), and<br><br>A.F. (Mother), | August 3, 2020<br><br>Court of Appeals Case No. 20A-JT-266<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn Moores, Judge |

*Appellant-Respondent,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Guardian ad Litem.*

The Honorable Scott Stowers,
Magistrate

Trial Court Cause No.
49D09-1904-JT-430
49D09-1904-JT-431

**Tavitas, Judge.**

# Case Summary

[1]     A.F. ("Mother") appeals the termination of her parental rights to her minor

children, R'N.F. and R'S.F. (the "Children").  We affirm.

# Issue

[2]     The sole issue on appeal is whether sufficient evidence supports the termination

of Mother's parental rights.

## Facts

[3] Twins, R'N.F. and R'S.F., were born to Mother and presumptive father, R.S.,[1] in March 2017. The Marion County Office of the Department of Child Services ("DCS") alleged that R'N.F. was born with "Fetal Alcohol Syndrome or with [a] Controlled Substance or Legend Drug in [her] Body[.]" Exhibits Vol. I p. 115. At the time of the Children's birth, Mother was nineteen years old and could not legally consume alcohol. DCS filed a petition alleging the Children were children in need of services ("CHINS") on November 7, 2017; however, after a fact-finding hearing, the trial court found the DCS did not meet its burden of proof and dismissed the CHINS petition.

[4] In March 2018, DCS received allegations that Mother abused drugs and lived with the Children in an unsanitary and unsuitable home. On March 22, 2018, family case manager ("FCM") James Oliver conducted a family assessment and an inspection of Mother's home. Mother did not have adequate food or clothing for the Children; there was trash throughout the home; the home lacked basic utilities; and the Children's sleeping area was cluttered with loose bedding and clothing, which posed a safety hazard for the babies. DCS removed the twelve-month-old Children that day.

[5] On March 26, 2018, DCS filed a petition alleging that the Children were CHINS. The trial court conducted a fact-finding hearing and, on June 20,

---

[1] R.S. is not a party to this appeal.

2018, adjudicated the Children as CHINS upon the finding that Mother failed to provide a safe, sanitary, and drug-free home. Following a dispositional hearing, the trial court entered a dispositional decree on July 18, 2018, wherein the trial court ordered Mother to participate in "home based therapy, home based case management; parenting assessment; random drug screens; and a substance abuse assessment in the event of a positive screen." Mother's App. Vol. II p. 24.

[6] Due to Mother's youthful age, DCS sought to bolster her parenting education and to provide her with the resources necessary to meet the Children's basic needs. Specifically, DCS referred Mother to home-based case management and home-based therapy services. Mother's engagement in services and level of participation was inconsistent; she rejected instruction; and she had angry confrontations with multiple service providers. As a result, many providers discharged Mother for noncompliance and/or personality conflicts. Also, Mother "did not participate" in random drug screens.[2] Tr. Vol. II p. 19.

[7] Following a March 2019 hearing, the trial court ordered the permanency plan for the Children to be changed from reunification to adoption and found:

> Mother has made no meaningful or sustainable progress toward reunification. She has been unsuccessfully discharged from all

---

[2] Although DCS substantiated the allegations of Mother's abuse of alcohol and THC in the 2017 CHINS action, the record is largely silent regarding whether DCS substantiated the alleged substance abuse claim in the instant matter. The record includes the trial court's order on a March 2019 permanency hearing that provided: "DCS reports that [M]other tested presumptively positive for amphetamines on Monday of this week." *See* Mother's App. Vol. II p. 37.

services ordered by the Court and has been assigned new service providers.  Mother struggles to parent the children during parenting time and has suggested that twice weekly parenting time is too much for her.  [ ] The [C]hildren are thriving in their current placement, which is pre-adoptive.

Mother's App. Vol. II pp. 37-38.

[8] On April 11, 2019, DCS filed petitions to terminate Mother's parental rights. The trial court conducted evidentiary hearings on the petitions for termination of parental rights on November 7, 2019, November 21, 2019, and December 4, 2019.  On December 26, 2019, the trial court terminated Mother's parental rights, pursuant to an order containing findings of fact and conclusions thereon. The order provided in part:

> 72. There is a reasonable probability that the conditions that resulted in the [C]hildren's removal and continued placement outside of the home will not be remedied by [M]other.  [Mother] has made no significant progress towards reunification.  She has been unsuccessfully discharged from services despite multiple referrals.  She has been inconsistent with parenting time with the [C]hildren, and is overwhelmed with even one session per week. [ ]

> 73. Continuation of the parent-child relationship poses a threat to the [C]hildren's well-being in that it would serve as a barrier for them obtaining permanency through an adoption when their parents are unable and unwilling to offer permanency and parent. The [C]hildren are thriving in their pre-adoptive placement.

> 74. Termination of the parent-child relationship is in the [C]hildren's best interests.  Termination would allow them to be

adopted into a safe and stable environment where their needs will be safely met.

75. There exists a satisfactory plan for the future care and treatment of the [C]hildren, that being adoption.

76. The [C]hildren have been placed in foster care for twenty (20) months where they are bonded and doing well. This is a pre-adoptive placement.

*Id*. at 26. Mother now appeals.

# Analysis

Mother appeals from the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's best interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *In re K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[10]     When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re. I.A.,* 934 N.E.2d 1127, 1132 (Ind. Ct. App. 2010). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[11]     Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)." Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[12]     Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

(A) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(B) that termination is in the best interests of the child; and

(C) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

### I.     *Threat to the Well-being of the Children*

Mother argues that "DCS did not present clear and convincing evidence that continuation of the parent-child relationship poses a threat to the well-being of the [C]hildren" because "Mother and Children [a]re bonded and no one voiced

a concern for the [C]hildren's safety."[3]  Mother's Br. p. 9.  When considering whether there is sufficient evidence to support such a finding, trial courts must "consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation."  *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005).  "At the same time, however, a trial court should judge a parent's fitness to care for his [or her] child as of the time of the termination proceeding, taking into consideration evidence of changed conditions."  *Id.*

[14]  "It is well established that 'a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship.'"  *In re G.F.*, 135 N.E.3d 654, 661 (Ind. Ct. App. 2019) (quoting *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002)).

[15]  At the evidentiary hearing, DCS presented extensive witness testimony.  Eileen Stinson of Dockside Services testified that she provided parenting aide services and supervised Mother's parenting time.  Stinson testified that she offered to supervise three supervised visits each week; however, Mother subsequently

---

[3] Mother also argues that there is no evidence to support the trial court's conclusion that the conditions that led to the Children's removal would not be remedied.  Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive; thus, we need only decide if the trial court's findings support one of these two requirements. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).  Accordingly, we do not reach Mother's claim that the trial court's conclusion that the conditions that led to the Children's removal would not be remedied is clearly erroneous.

complained that two weekly visits were too burdensome and only participated in one supervised visit each week. According to Stinson, Mother missed multiple parenting sessions and, when Mother attended sessions, Mother often was not receptive to instruction. *See* Tr. Vol. II p. 69 (testifying that "sometimes [Mother] was open to" instruction but that "[s]ometimes she basically told me to mind my own business and not tell her how to raise her Children"). Stinson testified further that Mother's level of participation briefly improved, but Mother failed to maintain her progress. Stinson also testified that Mother skipped or cancelled multiple supervised visits. Mother also prioritized her social life and often claimed she was too busy to meet Stinson. Additionally, Stinson testified that Mother developed an acrimonious relationship with Stinson, and Stinson planned to discharge Mother.

[16] Kevin Flowers of Dockside Services and Cummins Behavioral Health services testified that he provided home-based therapy and supervised visitation services to Mother. Mother failed to regularly attend supervised visits and missed multiple therapy appointments; Mother was unable to achieve the goal of increased parenting time; and Mother rejected Flowers' guidance. Flowers testified that Mother "was frustrated about the process" and verbally clashed

with Flowers. *Id*. at 106, 108 ("Mom was kind of up and down, was not really consistent with the parenting time").[4]

[17] Home-based therapy provider Ebony Shorts of Dockside Services testified that, after Mother completed an initial mental health assessment, "it took a while [to identify therapy goals] because [Mother] was inconsistent with therapy. And [ ] once we tried to develop goals, she started to become extremely non-compliant and then we moved toward discharge, so goals were never actually established . . . ." *Id*. at 90-91. Shorts testified that Mother required "coping skills[ ] and emotional regulation"; "had a hard time maintaining appropriate or healthy relationships with others"; rejected guidance; and was rude to service providers. At the fact-finding hearing, Shorts was asked to describe Mother's behavior:

> Q: [ ] Could you [ ] describe the behavior you witnessed?
>
> A: Yes. Yelling, argumentative, very combative during [child and family team meetings], making inappropriate comments, . . . and then, once redirected, just totally shutting down when someone said something that she didn't agree with.

Mother's App. Vol. II p. 25; Tr. Vol. II p. 91. Shorts also testified that Mother's attendance and level of engagement fluctuated:

---

[4] Flowers testified that he discharged Mother for lack of engagement and because Mother demanded a new service provider.

> The first three to four [therapy sessions], I believe . . . [Mother] was good, she completed the mental health assessment, very talkative, engaged. It wasn't until later on . . . that she started to be very combative, and then just didn't attend anything. But towards the beginning, . . . she was fine and then it took a turn for the worst [sic].

Tr. Vol. II p. 93. Shorts discharged Mother for inconsistency, confrontational behavior, and Mother's refusal to engage in therapy.

[18] William Opoku of New Hope testified that, as Mother's home-based therapy provider, he helped with Mother's decision-making, sobriety, stability, cultivation of healthy relationships, and parenting education. Opoku testified that, although Mother demonstrated progress regarding anger management issues, he believed that Mother required a psychological evaluation to address the root of her anger.

[19] Felix McGee of New Hope Indiana succeeded Opoku as Mother's home-based therapy provider. McGee testified that Mother made "very surface level" strides regarding her anger management, but additional work still needed to be done. *Id.* at 45. According to McGee, Mother's level of engagement was inconsistent, and issues remained regarding Mother's "instability[,]" "lack of consistency[,] just taking responsibility, and just kind of identifying the patterns." *Id.* at 46. McGee testified regarding the disparity between Mother's stated goals and her actions. *See id.* (testifying that Mother sought additional visitation hours but cancelled or cut visits short; Mother sought reunification but skipped appointments with service providers; Mother required stable

housing, but "jump[ed] around [between homes and jobs, which] affect[ed] [Mother's] budgeting"). McGee testified further that Mother fluctuated between being engaged in services and "[j]ust kind of disappearing [with] no communication at all." *Id*. at 48.

[20] Home-based parent aide Helena Wilson of New Hope provided case management services to Mother.[5] Wilson testified that Mother asked for assistance regarding a supervised visit and a medical or psychological appointment. In each instance, Mother failed to follow through with Wilson's efforts to assist her, which resulted in a cancelled supervised visit and a missed appointment. Wilson testified that Mother failed to achieve extended-duration supervised visits because Mother wavered between being engaged and cutting appointments short and "was just inconsistent across the board . . . ." *Id*. at 80. Regarding Mother's employment, Wilson testified, "[Mother]'s had about six places of employment. She gets the jobs . . . , just due to [her attitude, scheduling, or the wage rate,] she doesn't keep them very long". *Id*. at 79, 80. Wilson testified she intended to refer Mother to a new provider due to "tension and conflict" in their relationship and Mother's lack of consistent participation. *Id*. at 87.

---

[5] Wilson worked with Mother and supervised Mother's visitation both before and after the Children were removed from Mother's care. Wilson instructed Mother on how to maintain a clean home, referred Mother to food and clothing pantry resources, and assisted with Mother's finances and bills.

[21] FCM Chantal Borg testified that, during her tenure as Mother's FCM, Mother required multiple "re-referrals[,]" which generally occur when a service provider has discharged a parent upon unsuccessful completion of services.[6] *Id.* at 12. Borg testified that, at the end of her tenure as FCM, Mother had not successfully completed home-based case management, had not achieved her referral goals, and had not taken advantage of services.

[22] After a thorough review of the record, we cannot agree with Mother's contention that the trial court terminated her parental rights solely because it deemed the Children's pre-adoptive placement to be a better home for the Children. To the contrary, DCS proved, by clear and convincing evidence, that Mother lacks the ability to consistently parent the Children and provide a stable home.

[23] At the time of the evidentiary termination hearing, the Children, who were twelve months old at the time of removal, had been out of Mother's care for twenty months. Although Mother made some positive strides during that time, she failed to demonstrate the consistency inherent in parenting twins. Various service providers testified that, despite multiple referrals, Mother was unwilling or unable to achieve consistency in the critical areas of home-based therapy and case management. The goals of those services—consistency, adherence to a routine, receptiveness to help and instruction, planning, and organization—

---

[6] FCM Borg referred Mother to three different service providers for supervised visitation because Mother could not get along with her providers.

were critical to such a young parent's full-time parenting of twins. Mother, however, no-called, no-showed to appointments and visits; requested the reduction of her parenting time; rejected her service providers' guidance; and often refused outright to participate in services.

[24] Based on the foregoing, the trial court's finding that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the Children is supported by clear and convincing evidence. A substantial probability of future neglect or deprivation exists if Mother's parent-child relationship with the Children is allowed to continue.

## II. *Best Interests of the Children*

[25] Mother also argues that there is no evidence that termination of her parental rights is in the best interests of the Children. When we consider the best interests of a child, we look at the totality of the circumstances. *In re A.W.*, 62 N.E.3d 1267, 1275 (Ind. Ct. App. 2016). The trial court "need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *S.E. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 37, 47 (Ind. Ct. App. 2014), *trans. denied*. Although not dispositive, permanency and stability are key considerations in determining the best interests of a child. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same support[ ] a finding that termination of parental rights is in the best interests of the child[ ]." *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012) (citation omitted).

[26]     In addition to the testimony above, FCM Borg testified that she did not support giving Mother additional time to complete services because of Mother's lack of engagement; "unpredictab[ility]"; mental instability; and evolving housing and employment situations. Tr. Vol. II pp. 21-22, 26. Also, FCM Smith testified: "I don't know that [Mother] is able to provide [the Children] with stability. Nothing that she's done since . . . has shown me that[,]" and "[the] Children need stability." *Id.* at 126. Additionally, FCM Smith testified:

> At this time[, giving Mother additional time to complete services] is prolonging permanency for the children. Mo[ther] has continued to struggle with consistency and at this time the children are not able to achieve permanency based on the progress that [Mother has] made.

*Id.* at 118. We must agree.

[27]     Mother's inability or unwillingness to achieve consistency and Mother's failure to achieve her referral goals are recurring themes throughout DCS's case-in-chief. We acknowledge that Mother demonstrated some progress; however, a trial court "need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *See S.E.*, 15 N.E.3d at 47. During the Children's twenty-month wardship, Mother failed to demonstrate to DCS and a host of service providers that she could provide the permanency and stability that the Children require. Under the totality of the circumstances, we conclude that the record supports the trial court's finding that termination of Mother's parental rights is in the Children's best interests. *See Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007) (finding termination of

parental rights was in the best interests of the children where Lang was uncooperative with DCS and failed to complete services).

## Conclusion

[28] Sufficient evidence supports the termination of Mother's parental rights. We affirm.

[29] Affirmed.

Kirsch, J., and Pyle, J., concur.